2025 IL App (1st) 231399-U

FOURTH DIVISION
Order filed: March 27, 2025

No. 1-23-1399

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 90 CR 1812 |
| | ) | |
| JAMES BANNISTER, | ) | Honorable |
| | ) | Patrick Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Justice Lyle concurs in the judgment.
Justice Ocasio dissents in the judgment.

**ORDER**

¶ 1    *Held*: The third-stage denial of the defendant's petition for postconviction relief was not clearly erroneous when the defendant's claim of actual innocence depended on the credibility of a codefendant's recantation, the circuit court found the recantation to not be credible, and the court's credibility determination was itself not clearly erroneous. The second-stage dismissal of the defendant's claims of ineffective assistance of counsel was also not erroneous when the defendant failed to demonstrate prejudice from counsel's alleged errors, and the second-stage dismissal of the defendant's due process claims was likewise not erroneous when the claims failed to demonstrate a constitutional violation.

¶ 2      The defendant, James Bannister, was charged with two counts of first-degree murder for his role in the November 9, 1989, gang-related murders of Dan Williams and Thomas Kaufman at the Stateway Gardens housing complex in Chicago. He and five codefendants, James Young (James Y.), Michael Meyers, Kevin Young (Kevin Y.), Thomas Carter, and Eric Smith, were tried jointly before a jury, while a sixth codefendant, Michael Johnson (Michael J.), was tried separately.[1] The defendant was convicted and sentenced to life in prison. After the State's primary witness, Deanda Wilson (Deanda W.), recanted his trial testimony, the defendant was granted a second trial, at which the State presented new testimony from codefendant Michael J. implicating the defendant in the shooting. The defendant was again convicted and sentenced to life. The defendant then filed a petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) raising, among others, a claim of actual innocence based on an allegation that Michael J., like Deanda W., had since recanted his testimony implicating the defendant. The circuit court dismissed some of the defendant's claims at the second stage of proceedings and advanced some, including the actual innocence claim, to an evidentiary hearing. Following the hearing, the court disbelieved Michael J.'s recantation and instead found Michael J.'s inculpatory trial testimony to have been truthful. The court, therefore, denied the defendant's remaining claims. The defendant now contests the court's dismissal or denial of several of his claims, including his claim of actual innocence. We see no merit to his arguments on appeal and affirm.

---

[1] Because this order contains numerous references to two people with the last name "Young," two people with the last name "Johnson," and two people with the last name "Wilson," we will refer to those six people by their first name and last initial.

¶ 3      The background leading to this appeal, much of which we set forth in a previous appeal (*People v. Bannister*, 378 Ill. App. 3d 19 (2007)), is as follows. The shootings originated from the Stateway Gardens building at 3517-3519 South Federal Street. The shooters chased Dan Williams toward an Illinois Institute of Technology (IIT) research building across the street, where he stumbled to the ground. Both Williams and Thomas Kaufman, a security guard stationed inside the doors of the IIT building, were killed by the gunfire. The State presented evidence in support of its theory that Williams had been shot, in a case of mistaken identity, to avenge the sexual assault of codefendant Kevin Y.'s girlfriend, Audrey White, by members of a rival street gang, one of whom was also named "Williams."

¶ 4      At the defendant's joint trial with five of his six codefendants, the only direct evidence against the defendant was the testimony of Deanda W., who was then 12 years old and a member of the Del Vikings street gang. Deanda W. testified that, on the night of the shooting, he was with Willie Sims on the first-floor porch of the 3519 building when he saw the defendant and the six codefendants, all of whom were dressed in black, approach the building. The seven individuals were all members of the Gangster Disciples street gang, a rival of Deanda W.'s Del Vikings gang. Deanda W. claimed that the lighting was good and that he could see the faces of all seven men.

¶ 5      According to Deanda W., the defendant and codefendant Smith arrived first and waited near a janitor's closet in the breezeway under the building, at one point passing within 10 feet of him. After he saw the other five codefendants walk through the breezeway under the building, Deanda W. then went to a second-floor porch where he saw Kevin Y., Meyers, and Carter standing below him in front of the building and James Y. and Michael J. standing on the first-floor porch of the connected 3517 building. Williams was near a play lot in front of the building when someone

called out to him. Following a verbal exchange, all seven men, including the defendant, stepped out from their positions and fired at Williams, who stumbled toward the IIT building and fell between its doors. Deanda W. then went downstairs, ran to the 3517 building and up to the sixth floor, where he told his grandmother and Williams' mother about the shooting, before going back downstairs to talk to his mother. Deanda W. was cross-examined regarding certain alleged inconsistencies in his testimony, such as whether the shooters were wearing masks over their faces and whether he could actually see the defendant and Smith from his vantage point. On that latter point, Detective Edward Winstead testified that he had visited the second-floor porch where Deanda W. claimed to have seen the shooting, and from that location he could not see the breezeway and could only see a portion of the first-floor porch.

¶ 6     Audrey White testified that several hours prior to the shooting a meeting was arranged between her and Kevin Y. at the apartment of Lisa Tolbert, a friend who lived in the complex. At Kevin Y.'s request, White identified the people who had assaulted her. Kevin Y. and Carter left the apartment and returned later with Michael J., Meyers, and James Y. According to White, the five men again left the apartment at approximately 10 p.m., each dressed in black and carrying a gun. White stated that when the men returned approximately 20 minutes later, they were wearing ski masks or stocking caps over their faces. White testified that Kevin Y. took the guns the men were carrying and placed them in the radiator.

¶ 7     Denise Brady, a Stateway resident, testified that around 10 p.m. she noticed two men in dark clothing and ski masks standing near an elevator in the building's open first-floor lobby. She descended to the ground floor lobby where she saw a man she identified as Kevin Y. wearing dark clothes and a baseball cap. Brady testified that Kevin Y. yelled "come here" and then "come here,

mother\*\*\*," in the direction of Williams, who was approaching the building from the street. Kevin Y. then retrieved a gun from his coat and repeatedly fired at Williams, who began "running and weaving" towards the IIT building. Williams eventually stumbled onto the ground, as Brady fled upstairs towards her apartment. Brady indicated that when she reached the first floor she saw the two men in ski masks also shooting at Williams. When she looked down, she noticed another two shooters "spaced out" at either side of the building. Brady saw a total of five shooters.

¶ 8      Ruth Wilson (Ruth W.), who lived in an adjacent building, testified that she was in her bedroom when she heard shots coming from the 3517-19 building. When she looked out of her window, she saw "at least five" men, and possibly more, walking away from the 3517-19 building and towards her building. Each of the men was wearing dark clothing and a hat or hood over his head. Ruth W. recognized two of them as Kevin Y. and Carter and saw Kevin Y. put a gun under his coat. Ruth W. watched the men until they were out of sight, and then went to look for her son, Deanda W., who was outside. When she found Deanda W., he told her, "They shot Dan and I saw everything."

¶ 9      The defendant presented an alibi defense, calling four witnesses who testified that he was at home at the time of the shooting. The defendant was convicted of both counts of first-degree murder and sentenced to a term of natural life imprisonment. His convictions and sentence were affirmed on appeal. See *People v. Young*, 263 Ill. App. 3d 627 (1994).

¶ 10      In 1993, the defendant filed a petition for postconviction relief in which he claimed, among other things, that he was entitled to a new trial because Deanda W. had recanted his testimony implicating him in the murders. In an affidavit and in a court-reported statement, Deanda W. stated that at the time of the statement that he was 15 years old and now belonged to the same gang as

the defendant, the Gangster Disciples. Deanda W. further stated that, although he had seen seven people involved in the shooting, he could only positively identify four of them, and he was not certain about the identities of the remaining three, including the defendant.

¶ 11      Although the circuit court advanced certain other claims to an evidentiary hearing, the court dismissed the defendant's claim regarding Deanda W.'s recantation at the second stage and did not allow it to proceed to the evidentiary hearing. On appeal, this court reversed the dismissal of the defendant's claim regarding Deanda W.'s recantation and remanded for the court to hold an evidentiary hearing on that claim. See *People v. Bannister*, 299 Ill. App. 3d 1119 (1998) (unpublished order under Illinois Supreme Court Rule 23) (table) (*Bannister I*).

¶ 12      At the evidentiary hearing held on remand, Deanda W. testified that at the time of the shooting he was with his friend Scott O'Neal inside the 3644 building. Although he could hear the gunshots directed at Williams, he could not see them, and he assumed they were coming from the 3517-19 building. He spoke to the police immediately after the shooting and told them that he had not seen anything. The next day, he learned from Brady that the shooters had fled towards the 3547-49 building. Because that was the only building controlled by the Gangster Disciples, he assumed that the seven codefendants were the shooters, and he talked with three fellow gang members about "how to get [the codefendants] off the streets." Later that day, he called the police and arranged to meet with them. When he entered the interview room, laid out on the table were photos of six of the codefendants. He then told the police what he claimed to know about the shooting, which he testified was not the truth.

¶ 13      Sometime after his initial interview, Detective Winstead drove Deanda W. to testify before a grand jury. Deanda W. claimed that he told Winstead that he had not told the truth during his

interview and that Winstead reassured him that he was just scared and that he should just tell the grand jury what he said in the interview.

¶ 14    Deanda W. testified that two years later, in 1991, he was incarcerated and serving a four-month sentence for aggravated assault. He received a call from an Assistant State's Attorney (ASA) who told him that the State could make a pending drug-possession charge disappear if Deanda W. testified against the codefendants. On the morning of trial, Deanda W. told the ASA that he did not want to testify because he had not seen the shooting. Deanda W. testified that the ASA threatened to reinstate his drug charge if he did not testify. According to Deanda W., several days before the shooting he had been robbed by several of the codefendants, and he stated that he testified against them because he "hated them."

¶ 15    Ruth W. testified that immediately following the shooting, she found her son Deanda W. between the 3519 and 3546 buildings. Deanda W. told her that he had seen the shooting, but Ruth W. told him that she did not want to hear about it. Later that evening, Deanda W. again told her that he had witnessed the shooting and saw who the shooters were. He named six or seven people, only two of whom Ruth W. recognized: Kevin Y. and Carter. Several days later, Ruth W. accompanied Deanda W. when Detective Winstead drove him to testify before the grand jury. According to Ruth W., Deanda W. never told Winstead that he had lied about his knowledge of the shooting. Ruth W. did not want Deanda W. to testify because she did not want Deanda W. or herself to get hurt, but Deanda W. insisted that he wanted to "do it for Dan."

¶ 16    With respect to the defendant and codefendant Smith, the court found that Deanda W.'s trial testimony was "not accurate and truthful" and that there was no corroboration for Deanda W.'s implication of the defendant and Smith in the shooting. The court concluded that, as to the

defendant and codefendant Smith, the outcome of the trial "would probably have been different if not for [Deanda W.'s] perjured testimony." The court further recalled that, at the time of the defendant's trial, although the evidence was legally sufficient, it had disagreed with the jury's verdict and would have acquitted the defendant if it had been a bench trial. Accordingly, the court granted the defendant's postconviction petition requesting a new trial and vacated his convictions and sentence. The defendant subsequently filed multiple discovery requests and demands for trial and did not raise any double-jeopardy objections. The defendant was retried by the court after waiving his right to a jury.

¶ 17    In the second trial, the State presented the testimony of codefendant Michael J., who had been tried separately, convicted of both murders, and sentenced to natural life imprisonment. Michael J. acknowledged that he had consented to testify against the defendant as part of a plea agreement with the State. Under the terms of the plea agreement, Michael J. promised to testify truthfully in exchange for the State's promise to move for the vacation of his two murder convictions and sentence, accept a guilty plea on one count of murder, *nolle prosequi* the other murder charge, and recommend that the court impose a sentence of 60 years' imprisonment on the single murder conviction. The plea agreement also provided that Michael J. promised to testify in a manner that was consistent with his prior statements to police and to prosecutors, but the agreement would be rendered null and void if any of the representations contained in Michael J.'s prior statements, upon which the agreement was predicated, were found to be false. In addition, Michael J. testified that he had asked to be transferred from the super-maximum-security facility in which he had been incarcerated and that the State had promised to request a transfer to a different penitentiary.

¶ 18    At the second trial Michael J. further testified that, in 1989, he had been a member of the Gangster Disciples street gang for approximately 10 years. On the evening of November 9, 1989, he was walking through the Stateway Gardens housing complex with James Y. and Meyers when they met the defendant, Smith, Carter, and Kevin Y. near the 3651 building. All seven men went upstairs to apartment 309, which was the home of Tiya Young, Kevin Y.'s niece. There, they talked for about an hour, discussing a plan to shoot members of the Del Vikings street gang in revenge for the previous sexual assault of White.

¶ 19    After this discussion, the group left the apartment and went to the 3618 building. At that time, all seven men were armed with guns. Michael J. testified that he had a .25-caliber automatic, and the defendant had a .357-caliber revolver. When the group arrived at the second building, they encountered Andre Johnson (Andre J.), whom he knew as "Rick James," who greeted the defendant by his nickname, "Nubs."[2] Kevin Y. shot at Andre J., and then all seven men ran to the 3547-49 building, where they waited for about 20 minutes before returning to Tiya Young's apartment. The group remained there for 45 to 60 minutes.

¶ 20    Michael J. testified that, after leaving Tiya Young's apartment, the group walked to the 3617 building and encountered Daniel Nicholson, who was in a wheelchair. Michael J. stood on the first-floor porch with Carter and the defendant while Kevin Y., Smith, Meyers, and James Y. followed Nicholson into the hallway. All seven men had their guns out while Kevin Y. robbed Nicholson of some gold chains and other items. After robbing Nicholson, the group walked north

---

[2] During the course of this case, the following nicknames have been identified: The defendant, James Bannister (Numms, Nubs, Cortez Bannister); Thomas Carter (Slick, Tom Slick); Kevin Young (Ace Dog); Eric Smith (Starsky); Michael Meyers (Ice Mike); Michael Johnson (White Mike, Little Mike); James Young (Jamo, Jaimo); Andre Johnson (Rick James); Daniel Nicholson (Wheelchair Dan); Audrey White (Peaches).

to the 3547-49 building. Michael J. testified that he then told the others that he was going upstairs to his apartment to get a ski mask and some "wave" caps, which are like scarves. After retrieving the ski mask and caps, he rejoined the others, gave caps to Kevin Y. and Carter, and kept a ski mask for himself.

¶ 21    Thereafter, the seven men walked together to the 3517-19 building. According to Michael J., he and Meyers walked to the 3517 side of the building near the back hallway. Smith, Kevin Y., and Carter stood in the breezeway behind an area referred to as the "mailbox." The defendant and James Y. stood on the 3519 side of the building. As Michael J. and Meyers walked through the back hallway, they met Gregory Gordon, Willie Sims, and two women who were standing near the elevators. They also saw Denise Brady, Antoinette Barry, and Joe Johnson, who were coming out of the stairway.

¶ 22    Michael J. testified that he then heard Smith say, "come here, mother***." After hearing gunshots, he walked with Meyers to the front of the building to see what was happening. Michael J. stated that he saw Williams running while the defendant, Smith, Carter, Kevin Y., and James Y. were firing their guns at him. Kevin Y. stood behind the "mailbox," just inside the breezeway, with Smith and Carter. The defendant and James Y. were on the ramp from the 3519 side of the building. The defendant, James Y., Kevin Y., Smith, and Carter stepped out from underneath the building while shooting at Williams. Michael J. testified that he shot at Williams as Williams ran to a play lot, jumped the fence, and ran toward the IIT building.

¶ 23    All seven of the shooters then went to an apartment in the 3547 building and waited a few minutes until the police left the area. Michael J. stated that he then went with Meyers, James Y., Kevin Y., Carter, and the defendant to White's apartment in another building, but Smith drove

away in a car. After about ten minutes, the remaining members of the group left the apartment, and he went to the home of his aunt.

¶ 24    Michael J.'s testimony at the defendant's second trial was substantially consistent with the statement he gave the police on December 29, 1989, the day after his arrest. Michael J. acknowledged in his testimony that during that interview he initially denied any involvement in the shootings and, prior to his 1991 trial, he had moved to suppress his confession, asserting that he had not been advised of his *Miranda* rights before being questioned. Michael J. testified at the second trial that the basis for his motion to suppress had been untrue because he had in fact been advised of his rights prior to giving the statement.

¶ 25    Daniel Nicholson testified that he had been confined to a wheelchair since 1981 and, on November 9, 1989, he was visiting his sister who lived in Stateway Gardens. Between 9 and 10 p.m., he left his sister's apartment and went to visit White in the 3617 building. While waiting outside, he saw Kevin Y., Carter, James Y., Smith, Meyers, Michael J., and the defendant. All seven men pulled guns, and Kevin Y. and Meyers robbed him of three gold chains, a watch, and two diamond rings. Afterward, Smith told him to just roll down the ramp and not look back. Nicholson stated that, as he was leaving, he saw Williams and told him that he had just been robbed and that Williams should go to the front of the building. Despite his warning, Williams walked to the back of the building. As he was going up the ramp of his sister's building, Nicholson heard someone say, "[c]atch that mother***." Looking backward, he saw that Williams was running from several people who were chasing him. He also heard several gunshots and saw flashes of gunfire.

¶ 26    Gregory Gordon testified that in November of 1989, he lived in Stateway Gardens in the 3517-19 building. Between 9 and 10 p.m. on November 9, 1989, he was with a person known as "Big Will." As the two men stood near the ground-floor elevators on the 3517 side of the building, they saw seven men, all of whom were dressed in dark clothing, walk into the breezeway under the building. Some of the men had bandanas or scarves over their faces. According to Gordon, Michael J. and Meyers walked past the elevators, then "one went up back and one went up the front stairway." Two other men went behind a breezeway pillar on the 3519 side of the building, but Gordon was unable to see their faces. Gordon stated that he recognized the other three men as Carter, Smith, and Kevin Y. All seven men were holding guns in their hands.

¶ 27    While he pressed the elevator button, Gordon heard someone say, "[c]ome here, mother***," and he then heard several gunshots. Gordon saw Kevin Y., Smith, and Carter in front of the breezeway when the shooting started. When the elevator doors opened, he got inside along with Big Will, two girls, and another man. In the elevator, he heard another volley of gunshots before he got off on the 10th floor. Gordon then walked to the edge of the porch and looked down, where he saw someone crawling on the ground near the IIT building. He then looked over the porch on the other side of the building and saw seven men walking in a line toward the 3547-49 building. Gordon testified that he subsequently viewed police photographs and identified Kevin Y., Smith, Carter, Meyers, and Michael J. as five of the seven men he had seen on the night of the shooting. He also identified photographs of the defendant and James Y. as people he recognized from the neighborhood, but he was unable to state with certainty that they were members of that group. Gordon testified that he specifically saw five of the seven men actively shooting at

Williams, and he identified those five as Kevin Y., Smith, Carter, and the two men whose faces he did not see.

¶ 28 Gordon acknowledged in his testimony that on August 29, 1990, he signed a statement exonerating Smith, but he explained that he was coerced into doing so. Gordon testified that he feared for his life and was forced to give that statement by Demetrius Jackson, who had a gun and whom he believed was a member of the Gangster Disciples. Due to this fear, he asked the State not to call him to testify at the defendant's first trial.

¶ 29 The State also called Deanda W., who was then serving a sentence for murder in a Minnesota prison. Contrary to his first-trial testimony, at the defendant's second trial Deanda W. denied seeing the shootings of Williams and Kaufman at all. Deanda W. stated that he was at a completely different building and knew nothing of the murders until he heard gunshots. Deanda W. testified that he looked out of a window after the shooting was all over, and he did not see any of the shooters. The prosecution introduced Deanda W.'s prior inconsistent statements made during his testimony at the defendant's first trial, Michael J.'s trial, and during the proceedings before the grand jury. Deanda W. admitted that he had previously testified that the defendant was present at the scene and shot at Williams but declared that those statements were untrue.

¶ 30 Denise Brady testified consistently with her previous testimony at the defendant's first trial. At the second trial, she again recounted that she saw five people shooting at Williams, including three men in the breezeway and two men on the porch. She was only able to identify Kevin Y. as one of the shooters.

¶ 31 Rochelle Jackson, a Stateway resident, was a new witness at the second trial. She testified that she was in her bedroom in her second-floor apartment in the 3519 building when she heard

gunshots. She ran to the window, where she saw "approximately four to five guys" running towards the 3547-49 building. The men were all wearing what she described as black skullcaps.

¶ 32    As in his first trial, the defendant presented an alibi defense and called several witnesses who testified that he was at home on the night of the shootings. Upon consideration of all of the evidence presented, the court found the defendant guilty on both counts of first-degree murder. The defendant subsequently filed post-trial motions for a new trial and for acquittal and dismissal based on double-jeopardy violations. The court denied these motions and sentenced the defendant to natural life in prison.

¶ 33    On appeal, the defendant argued, among other things, that his retrial violated his right to double jeopardy and that the terms of Michael J.'s plea agreement requiring consistency with prior statements violated his right to due process and a fair trial. This court found that, even though he had forfeited his double jeopardy argument, the defendant's retrial was nonetheless proper because the circuit court had not found that the evidence was legally insufficient (*Bannister*, 378 Ill. App. 3d at 28-31 (*Bannister II*)), and that Michael J.'s plea agreement did not violate the defendant's right to due process because the agreement required Michael J. to testify truthfully (*id.* at 33). Accordingly, we again affirmed the defendant's convictions and sentence. The Illinois Supreme Court granted review, examined the defendant's arguments regarding Michael J.'s plea agreement, and ultimately affirmed this court's decision. See *People v. Bannister*, 236 Ill. 2d 1 (2009) (*Bannister III*).

¶ 34    In February 2010, the defendant filed a *pro se* petition for postconviction relief, which is the focus of the present appeal. Counsel was appointed to represent the defendant, and counsel subsequently amended the defendant's petition three times. In the amended petition, the defendant

claimed that he had new evidence demonstrating actual innocence and prosecutorial misconduct. Specifically, the defendant alleged that an inmate named Wayne Millighan had informed investigators for the State's Attorney's Office that he had spoken with Kevin Y. in 2008 and that Kevin Y. "admitted being at the crime scene with all of the individuals accused of the murder except one, [the defendant], who was not there." The defendant also alleged that an inmate named Larry Mack had provided an affidavit recounting conversations with Kevin Y. in which Kevin Y. similarly stated that the defendant was not involved in the shootings. According to Mack, Kevin Y. refused to testify at the defendant's trial because it might hurt his appeal. Mack also averred that he had spoken with Carter and Meyers and that both stated that the defendant had nothing to do with the murders.

¶ 35 The defendant also alleged that his postconviction counsel and an investigator, John Laskey, visited Michael J. in prison in August 2014. According to an affidavit executed by Laskey, Michael J. had reservations about discussing the matter out of concern about the impact on his agreement with the State, but Michael J. stated "off the record" that the defendant had nothing to do with the shooting. The defendant also provided an affidavit from Andre J. in which Andre J. averred that the defendant was not present when he was shot. According to Andre J., he spoke with investigators for the State prior to the defendant's retrial and repeatedly informed them that the defendant was not involved. In a supplement to the amended petition, the defendant submitted a transcript and a video of an interview that Michael J. gave to ASA Mark Rotert, Director of the Cook County State's Attorney's Conviction Integrity Unit. In the interview, Michael J. admitted to testifying falsely at the defendant's retrial and stated that the defendant was not present for any of the events occurring around the shootings of Williams and Kaufman.

¶ 36    Based on this evidence the defendant raised eight claims for relief, the following six of which remain relevant on appeal: (1) that he is actually innocent; (2) that he was denied due process by the State's presentation of Michael J.'s allegedly perjured testimony at his retrial; (3) that trial counsel rendered ineffective assistance by failing to introduce evidence establishing the falsity of Michael J.'s testimony; (4) that he was denied due process and the effective assistance of trial and appellate counsel when Deanda W. was allowed to testify at his second trial and present testimony that had previously been found to have been false; (5) that his appellate counsel rendered ineffective assistance by not properly arguing his double jeopardy claim; and (6) that the cumulative effect of these issues denied him due process and a fair trial.

¶ 37    At the second-stage, the State moved to dismiss the defendant's petition. The circuit court advanced four of the defendant's claims to a third-stage evidentiary hearing, including his claim of actual innocence and his claim that counsel was ineffective for failing to call White as a witness. The court dismissed the defendant's remaining claims.

¶ 38    At the third-stage evidentiary hearing, the defendant presented testimony from four witnesses, three of whom are relevant to the issues on appeal. Larry Mack testified that he was presently incarcerated for murder and had met the defendant at Statesville Correctional Center. In 2004, Mack shared a cell with Kevin Y. at Statesville. In one conversation, Kevin Y., who is now deceased, told Mack that the defendant was out on bond and was going to be retried and that Michael J. was going to testify against him. According to Mack, Kevin Y. said that Michael J. was going to testify falsely that the defendant was at the scene of the shooting at issue. Kevin Y. told Mack that the defendant was not involved and that he was going to testify to that effect at the defendant's retrial. However, Mack testified that Kevin Y. ultimately decided not to testify because

doing so might have adversely affected his appeal. In 2005, Mack met the defendant at Statesville and told him about Kevin Y.'s decision not to testify. A few months later, Mack relayed the same information during a conversation with the defendant's attorney and an investigator. Mack also testified about a subsequent conversation that he overheard in the prison law library between codefendants Meyers, Carter, and James Y. According to Mack, the codefendants acknowledged that the defendant was not present for the shooting.

¶ 39    Andre J. testified at the second evidentiary hearing that in the early evening of November 9, 1989, he left his apartment at Stateway Gardens to go to the front of the building. At the bottom of the stairs, he encountered Michael J. He then exited the stairwell and went outside, where he saw Meyers, Michael J., Carter, and James Y. standing behind a mailbox. The four men pointed at him, and he then hurried down a ramp. When he reached the bottom of the ramp, Kevin Y. stepped out from behind the mailbox and called to him, asking him to come over to talk about a woman who had been assaulted. When Andre J. refused, Kevin Y. shot at him, hitting him twice. When asked whether he saw anyone running away, Andre J. testified that he did, the same five people that were standing around the mailbox. Following the incident, Andre J. told the police what had happened and who was present. The defendant introduced into evidence a police report regarding the incident corroborating Andre J.'s testimony.

¶ 40    Michael J. testified at the second evidentiary hearing that in November 1989 he lived with his girlfriend at Stateway Gardens and was a member of the Gangster Disciples. In the afternoon of November 9, 1989, he was with Meyers and James Y., both of whom were also members of the Gangster Disciples. The three men went to the 3651 building, where they saw fellow Gangster

Disciples Kevin Y. and Carter. Michael J. knew who the defendant was, and he knew the defendant's nickname to be Nubs. According to Michael J., the defendant was not with the group.

¶ 41    The five men then went to a different building in the complex, where they encountered Andre J. Kevin called out to Andre J. and then started shooting at him. According to Michael J., Andre J. did not say "What up, Nub," and the defendant was not present at that time. The five men then ran back to the 3651 building and went up to Kevin's niece's apartment. Once there, Kevin called Smith, who arrived at the apartment shortly thereafter. The group stayed at the apartment for five to ten minutes, before going towards the 3547-49 building. On the way there, they ran into Nicholson, whom Michael J. knew as "Wheelchair Dan." The defendant was still not with the group at that point. Kevin took some jewelry from Nicholson, and the group continued to the 3547-49 building.

¶ 42    Michael J. then went to his apartment to retrieve ski masks and "do-rags," which he gave to Kevin Y. and James Y. According to Michael J., the men were all armed. The group then walked to the 3517-19 building. Once there, he and Myers went to the back hallway on the 3517 side of the building, while Kevin Y., Carter, and Smith stood by the mailbox in the breezeway and James Y. and the defendant were on the 3519 side of the building. Michael J. then heard Smith say, "Come here, MF," followed by the sound of gunshots. Michael J. saw the target of the shooting running toward the IIT building, and he then joined in and fired his gun at the man. The defendant was not present at any point. Following the shooting, all six men ran back to the 3547 building. Smith got in a car and drove off, and the remaining five went up to Tolbert's apartment on the 16th floor, where they saw White.

¶ 43    Michael J. further testified that on December 20, 1989, he was arrested and questioned about the Andre J. shooting and the murders of Williams and Kaufman. During questioning, the detectives showed him pictures of seven people. After initially denying his involvement in those crimes, Michael J. eventually confessed to his role in the shootings and also implicated the defendant. He explained that he included the defendant among those involved because the detectives had threatened him with the death penalty and the defendant's photo was in a group of photos he was shown. In his words, he "went along with the script they [were] giving [him]."

¶ 44    While he was in custody awaiting trial, Michael J. had conversations with Smith and eventually agreed to execute an affidavit swearing that Smith was not involved in the murders at issue. He admitted that the statement was not true, and he explained that he felt pressure to sign the affidavit because of his membership in the Gangster Disciples.

¶ 45    Following his trial, Michael J. was found guilty, sentenced to natural life, and eventually placed in Tamms Correctional Center, a supermax prison where he was isolated for 23 hours each day and was not allowed any visits or phone calls. In 2004, after he had been at Tamms for four or five years, the State's Attorney's Office approached him with an offer in which, in exchange for testifying against the defendant and Smith, his sentence would be reduced to 60 years to be served at 50 percent, and he would be transferred from Tamms to a medium-security prison. Michael J. agreed to the arrangement and implicated the defendant in the shooting, a decision that he said was motivated by his desire to go home. As a result of the plea agreement, Michael J. had been paroled by the time of the defendant's second evidentiary hearing.

¶ 46    The parties entered a stipulation that, if called, the defendant's trial counsel would testify that she does not remember why White was not asked certain questions at the defendant's trial.

¶ 47     After the defendant rested, the State called Margaret Bamford, an investigator for the Cook County State's Attorney's Office. Bamford testified that, in April 2004, she participated in an interview of Michael J. At that time, Michael J. had not yet entered into a plea agreement with the State, but the parties had agreed that any information he provided during the interview could not be used against him. In the interview, Michael J. stated that, during his 1989 post-arrest questioning, he was not being truthful with the police when he initially denied involvement in the shooting at issue and that he was being truthful when he subsequently admitted that both he and the defendant were involved in the shooting. According to Bamford, at a subsequent interview in May 2004, Michael J. reaffirmed that his statements during the April 2004 interview were truthful and that all six of his codefendants, including the defendant, were properly identified and charged. The State then rested.

¶ 48     Following the third-stage evidentiary hearing, on July 7, 2023, the circuit court issued an order denying the defendant's petition. In relevant part, the court found that Andre J.'s testimony that he saw four other people present when Kevin Y. shot him was not material as it relates to the defendant's involvement in the subsequent shooting of Williams and Kaufman because the shootings occurred several hours apart and it was possible that Andre J. was not able to see all of the people present while he was being shot at. The court also found that, even if believed, Andre J.'s testimony did not sufficiently undermine Michael J.'s testimony at the defendant's second trial because Michael J. made a statement against penal interest implicating the defendant in 1989, 15 years before his plea agreement with the State and at a time when he had no motivation to lie. The court also observed that the factfinder at the defendant's second trial could have considered Deanda W.'s testimony implicating the defendant at the first trial, testimony that,

although recanted, was corroborated by Deanda W.'s statement to his mother soon after the shooting in which he claimed to have seen everything. Additionally, the court noted that Nicholson had testified at the second trial that the defendant was among a group of seven people who were present when Kevin Y. robbed him prior to the shooting of Williams and Kaufman, and Gordon saw seven people walking towards the 3547-49 building after the shooting.

¶ 49    The court also found no merit to the defendant's claim that trial counsel rendered ineffective assistance by failing to elicit impeachment evidence from White regarding the number of people she saw at Tolbert's apartment before and after the shooting. Specifically, based on counsel's closing argument and her limited direct-examination questioning of White, the court found that White had been called solely to impeach Nicholson. The court concluded that the defendant failed to establish that counsel's strategic decision amounted to deficient performance because White's story also had elements that were inculpatory for the defendant. The court further found, without explanation, that the defendant had failed to demonstrate prejudice.

¶ 50    Finally, the court found that the defendant had failed to prove that newly discovered evidence demonstrated his actual innocence. The court began by stating that it "views the present recantation of [Michael J.'s] testimony with great skepticism." It then explained that, after initially giving a false alibi, Michael J. confessed in 1989 in a court-reported statement to committing the offense together with his six codefendants, including the defendant. Because that statement was against his self-interest, the court believed that it carried indicia of reliability. The court also observed that Michael J.'s 1989 confession was corroborated by the testimony of Deanda W. at the defendant's first trial and that both Michael J.'s second-trial testimony and Deanda W.'s first-

trial testimony were further corroborated by other witnesses at the second trial, including Nicholson, White, Andre J., Ruth W., and Gordon.

¶ 51   The court was also unconvinced by Michael J.'s explanations in his recantation as to why he falsely named the defendant as one of the shooters. The court observed that in his 1989 statement Michael J. made multiple references to the defendant's involvement in the shooting, including that Andre J. had greeted the defendant by his nickname, the type of weapon that the defendant used, and the positioning of the defendant, and the court did not believe that such a "detailed account of [the defendant's] actions was generated by [Michael J.] simply being shown a seventh photograph by the police." The court also found Michael J.'s allegation that he was threatened with the death penalty incredible, with the court noting that Michael J. had not mentioned that alleged threat in his video-taped recantation and instead stated at that time that he "couldn't tell you" and "didn't know" why he implicated the defendant. The court also observed that Michael J. had not mentioned the death-penalty threat in his own case and instead only challenged his confession on *Miranda* grounds. Ultimately, for all of those reasons, the court stated that it was "convinced that [Michael J.'s] initial statements he made that were against his penal interest in 1989 were truthful."

¶ 52   The court continued by adding that it believed that there was "substantial evidence in the record that Deanda W.'s recantation of his testimony from the first trial was false," including references to gang intimidation, Deanda W. changing his own gang allegiance, the payment of money to Deanda W., a prior shooting of Deanda W. allegedly committed by a relative of one of the codefendants, inconsistencies between his testimony at the second trial and prior sworn

statements he made during the postconviction proceedings, and testimony that he was fearful harm would befall him or his mother.

¶ 53 The court was also unpersuaded by the testimony of Mack, finding that it was "entirely based on hearsay, including a rather fortuitous overhearing at Statesville's library of four of the co-defendants discussing [the defendant's] lack of involvement in a crime that had occurred six years earlier." The court added that it believed that "Mack is biased as he has a relationship with [the defendant] in the Illinois Department of Corrections and is trying to help [the defendant] out by doing what, '[Kevin Y.] should have done.' " The court, therefore, denied the defendant's claim of actual innocence. This appeal follows.

¶ 54 The defendant raises three issues in this appeal, arguing (1) that the circuit court applied the wrong standard in denying his actual innocence claim following the third-stage evidentiary hearing; (2) that the circuit court erred in dismissing at the second stage his claims that trial counsel rendered ineffective assistance by (a) failing to seek dismissal of the charges on double jeopardy grounds prior to the second trial, (b) not seeking to have Deanda W.'s testimony from the first trial barred from being introduced in the second trial on collateral estoppel grounds, and (c) failing to introduce exculpatory evidence through several different witnesses; and (3) that the circuit court erred in dismissing at the second stage his due process claims (a) that the State knowingly used perjured testimony and (b) that his retrial violated his protection from double jeopardy.

¶ 55 The Act provides a three-stage review process for a defendant's postconviction claim of a constitutional violation, the second and third of which are at issue in the present appeal. "At the second stage, *** all well-pleaded facts that are not positively rebutted by the trial record are taken as true; the trial court does not engage in any fact-finding or credibility determinations." *People v.*

*House*, 2023 IL App (4th) 220891, ¶ 77 (citing *People v. Domagala*, 2013 IL 113688, ¶ 35). "The question raised in an appeal from an order dismissing a postconviction petition at the second stage is whether the allegations in the petition, liberally construed in favor of the [defendant] and taken as true, are sufficient to invoke relief under the Act." *Id.* (quoting *People v. Sanders*, 2016 IL 118123, ¶ 31). At a third-stage evidentiary hearing, the defendant must show by a preponderance of the evidence that there was a substantial violation of a constitutional right during his trial proceedings. *People v. Coleman*, 2013 IL 113307, ¶ 92 (citing *People v. Stovall*, 47 Ill. 2d 42, 47 (1970)). "At the third stage, unlike the first and second stages, the allegations are not taken as true; instead, 'the trial court acts as a factfinder, making credibility determinations and weighing the evidence.' " *House*, 2023 IL App (4th) 220891, ¶ 78 (quoting *People v. Reed*, 2020 IL 124940, ¶ 51)). "A reviewing court will not reverse a trial court's findings regarding credibility determinations or fact finding after a third-stage evidentiary hearing unless the findings are manifestly erroneous." *Id.* (citing *Reed*, 2020 IL 124940, ¶ 51). The court's ultimate decision to deny relief following an evidentiary hearing is likewise reviewed for manifest error. *Coleman*, 2013 IL 113307, ¶ 98 (citing *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). Manifest error is clear, plain, and indisputable, and "a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.* (citing *Morgan*, 212 Ill. 2d at 155, and *In re Cutright*, 233 Ill. 2d 474, 488 (2009)).

¶ 56    In his first argument on appeal, the defendant contends that the circuit court applied the incorrect standard when denying his actual innocence claim at the third stage and that under the correct standard he would have been entitled to relief. For a claim of actual innocence, a defendant "must present new, material, noncumulative evidence that is so conclusive it would probably

change the result on retrial." *Id.* ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). The only element at issue here is whether the defendant's new evidence is sufficiently conclusive, meaning that "the [new] evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* (citing *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009)). To determine whether new evidence is conclusive, the circuit court "must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make. But the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Id.* ¶ 97.

¶ 57    The defendant contends that the circuit court erred in this case by improperly focusing on whether he was guilty, rather than whether the new evidence was of a conclusive character. He further argues that this amounts to an error of law warranting *de novo* review (see *People v. Campos*, 349 Ill. App. 3d 172, 176 (2004) ("Whether the trial court applied the proper legal standard is a question of law, which is subject to *de novo* review.")), and that he met his burden of demonstrating conclusiveness under the proper standard. We disagree with the defendant's view of the issue.

¶ 58    At the outset of its analysis of the defendant's actual innocence claim, the circuit court properly recited the applicable legal standards as stated in *Coleman*. After setting forth those principles, the court stated, "[t]he purpose of the third-stage evidentiary hearing in this case was to determine whether the new evidence was of such conclusive character that it would probably change the result on retrial." The court then considered the impact of the defendant's newly discovered evidence when considered alongside the evidence presented at the previous trials.

While it is true that the court never again explicitly used the word "conclusive" or otherwise discussed the conclusiveness standards, the court also did not use any form of the words "guilt" or "innocence," and there is nothing in the court's analysis suggesting that it was attempting to determine the defendant's ultimate guilt or innocence. Indeed, rather tellingly, in his brief the defendant does not point to any specific language or portion of the court's order evincing such an improper analysis. Instead, he merely states in a conclusory manner that the court "simply decided that [it] personally disbelieved all the defense's evidence, would credit [Michael J.'s] and [Deanda W.'s] recanted inculpations, and therefore believed [the defendant] to be guilty," followed by a citation to a nine-page span of the court's order, which comprises the entirety of the court's analysis of the defendant's actual innocence claim.

¶ 59     In his reply, the defendant seems to add some elaboration on this point by stating that the circuit court took a "legally erroneous approach" because it "chose not to believe [Michael J.]" and rejected Michael J.'s recantation "[i]nstead of considering whether [Michael J.'s] testimony exculpating [the defendant] and contradicting the only inculpatory testimony from the second trial—[Michael J.'s] own accusations—might change the outcome of a new trial." To the extent that the defendant is arguing that the circuit court cannot reject testimony from a witness whom it finds not credible, that contention lacks merit. Determining the credibility of witnesses and the weight to be accorded to their testimony is precisely one of the circuit court's chief tasks at a third-stage evidentiary hearing. See *Morgan*, 212 Ill. 2d at 165 (explaining that it is the circuit court's role to assess the credibility of recantation testimony and that it is proper for the court to reject testimony that it finds not credible). If the court finds that a witness is not credible, then it follows that the witness' testimony would not increase the likelihood of a different result on retrial.

Accordingly, the credibility of a witness and the corresponding weight to be given to that witness' testimony is a fundamental component of the conclusiveness analysis of an actual innocence claim, and it is properly within the circuit court's ambit to evaluate witness credibility and reject testimony that it finds unbelievable.

¶ 60    We are thus unpersuaded by the defendant's limited and unsupported argument that the circuit court applied an incorrect standard and that *de novo* review is appropriate in this case. Rather, because the court recited the appropriate legal standards and conducted an analysis that was consistent with the proper application of those principles, we will review the court's denial of the defendant's actual innocence claim under the manifest-error standard.

¶ 61    Turning to the merits of the defendant's claim, we conclude that the defendant has failed to show that the circuit court committed manifest error in denying his actual innocence claim. The defendant's claim was based on Michael J.'s recantation of his prior testimony implicating the defendant in the shooting of Williams and Kaufman, as well as the affidavits from Mack and Millighan in which both men asserted that the now-deceased Kevin Y. told them that the defendant was not involved in the shooting. The circuit court found that Michael J.'s recantation was not credible and that, instead, it was Michael J.'s 1989 inculpatory statement and his testimony at the defendant's second trial that were truthful. It further gave little weight to Mack's testimony, which it found to be "biased" and based on "unreliable hearsay." The court did not address Millighan's affidavit.

¶ 62    The defendant contends that the court's denial of his actual innocence claim on these grounds was erroneous because "[o]n retrial, a jury could certainly be persuaded by Michael J.'s sworn testimony that he inculpated [the defendant], not because [the defendant] actually

participated in this crime, but instead because [Michael J.] received an incredible deal for himself in exchange for his inculpatory testimony." However, whether a jury "could" be persuaded by Michael J.'s recantation is not the question before us. Instead, at the present appellate stage of proceedings, the defendant must show that the circuit court's rejection of Michael J.'s recantation was manifestly erroneous, meaning that an opposite conclusion is clearly evident. The defendant's contention that a jury "could" believe Michael J.'s recantation does not establish such an error.

¶ 63     The defendant is certainly correct that there is evidence in the record corroborating or supporting the veracity of Michael J.'s recantation and contradicting Michael J.'s testimony implicating him. Indeed, there is no question that Michael J. received a highly enticing offer from the State in exchange for testifying against the defendant. Instead of serving the rest of his life being isolated in a supermax prison, Michael J. was moved to a lower-security prison and has already been released on parole as a result of the arrangement. That agreement provided strong motivation for Michael J. to testify that the defendant was involved in the shooting at issue. Further, Michael J. testified that he was threatened with the death penalty if he did not inculpate his codefendants, and his claim that he went along with "the script" and implicated the defendant because the defendant's photo was among the group of seven photos that police showed him was corroborated to some degree by Gordon, who testified that he was shown seven photos, and by Deanda W., who stated that he was shown the same seven photos, plus an additional photo.

¶ 64     The defendant also asserts that Michael J.'s trial testimony that he was one of seven shooters was contradicted by several witnesses. Specifically, Jackson testified that after she heard gunshots she saw four or five men running towards the 3547-49 building. Brady testified that she saw five shooters. Ruth W. testified that when she looked out her window after hearing the

gunshots she saw at least five men, although possibly more. White testified that the group of codefendants whom she saw in Tolbert's apartment immediately before and after the shooting comprised only five people and did not include the defendant. And Andre J. testified that he saw five people standing around the mailbox when Kevin Y. shot him earlier in the evening.

¶ 65    Along those same lines, the defendant further argues that there were material flaws in the testimony of the three witnesses who claimed that there were seven shooters. Deanda W.'s account has been found in the defendant's previous postconviction proceeding to have been perjured. Nicholson claimed that he was robbed by the seven codefendants, including the defendant; however, Nicholson recalled that the robbery occurred shortly before the Williams shooting, while Michael J. testified that it was several hours earlier, and White testified that she was not home at the time that Nicholson claimed he spoke with her at her apartment immediately before the robbery.

¶ 66    The defendant also contends that, in Michael J.'s trial testimony implicating him, Michael J.'s account of where each of the codefendants was positioned immediately before and during the shooting conflicted with the accounts provided by Gordon and Deanda W., if Deanda W.'s first-trial testimony is to be believed.

¶ 67    However, contrary to the defendant's argument, our review of the testimony reveals that those three witnesses' accounts are largely consistent. Michael J. testified that he and Meyers went to the back hallway on the 3517 side of the building, while Kevin Y., Smith, and Carter were by the mailbox in the breezeway and James Y. and the defendant were on the 3519 side of the building. Gordon similarly testified that Michael J. and Meyers walked past the elevators before "one went up back and one went up the front stairway," that Kevin Y., Smith, and Carter were in

front of the breezeway, and that two unknown men went behind a breezeway pillar on the 3519 side of the building. In Deanda W.'s first-trial account, James Y. and Michael J. were on the first-floor porch of the connected 3517 building, Kevin Y., Meyers, and Carter were in front of the building, and the defendant and Smith were near a janitor's closet in the breezeway. Contrary to the defendant's argument, all three accounts were consistent with regards to the codefendants being separated into three smaller groups of two, three, and two people; Michael J.'s and Gordon's accounts were generally consistent with one another regarding the specific locations of those groups and the identities of the individuals within them; and Deanda W.'s account was also consistent with Michael J.'s in regard to the location of the defendant.

¶ 68    This consistency was a significant component of the analysis leading to the circuit court's conclusion that Michael J.'s recantation lacked credibility and that his trial testimony implicating the defendant was truthful. In addition, the court observed that Michael J.'s 1989 inculpatory statement was made against his self-interest and implicated himself in the crime, which generally makes a statement more reliable. See *People v. James*, 118 Ill. 2d 214, 223 (1987). Further, at the time that he made that statement, Michael J. had not consented to any plea agreement with the State and had no reason to falsely implicate the defendant, and the circuit court found that Michael J. had not given a convincing explanation for doing so, with Michael J. initially stating that he "didn't know" and "couldn't tell you" why he named the defendant as one of the shooters. Further, the court observed that Michael J. gave a detailed account of the defendant's involvement in the shooting, including that Nicholson had greeted the defendant by his nickname, that the defendant's weapon was a .357-caliber revolver, and that the defendant and James Y. were positioned on the 3519 side of the building at the time of the shooting. The court found that

Michael J. would not have generated those details from merely being shown a photograph of the defendant. The court also noted that Michael J. had previously admitted to having given a false recantation at the direction of Smith.

¶ 69     When we look at all of these facts together, we cannot say that the circuit court committed manifest error in denying the defendant's actual innocence claim. While there is evidence supporting Michael J.'s recantation, there is just as much, and perhaps more, evidence contradicting it and instead supporting his second-trial testimony implicating the defendant. As the circuit court observed, "[t]he recantation of testimony is regarded as inherently unreliable. As a result, the courts will not grant a new trial on that basis except in extraordinary circumstances." *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (citing *People v. Steidl*, 142 Ill. 2d 204, 260 (1991)). And with that principle in mind, we are unable to say that it is clearly evident that the circuit court should have reached the opposite conclusion and found Michael J.'s recantation credible and truthful.

¶ 70     The court's analysis of Michael J.'s 1989 statement and its finding that the details of Michael J.'s implication of the defendant were not likely born out of simply being shown the defendant's photo were entirely reasonable. Further, Michael J.'s second-trial account of the shooting and the positioning and actions of the various codefendants was consistent with the account given by Gordon. Nicholson likewise testified that there were seven people in the group that robbed him and that the defendant was among them. In other words, there was ample evidence supporting the court's conclusion that Michael J. was telling the truth in his 1989 confession and in his testimony at the defendant's second trial. Accordingly, the court's rejection of Michael J.'s recantation was not manifestly erroneous. Without Michael J.'s recantation, the defendant is

unable to show that the result would probably be different on retrial, and he, therefore, fails to establish the conclusiveness element of his actual innocence claim. As a result, the circuit court did not commit manifest error in denying the claim.

¶ 71    In his second issue, the defendant asserts that the circuit court erred at the second stage of proceedings in granting the State's motion to dismiss his claims that trial counsel rendered ineffective assistance by (1) failing to seek dismissal of the charges on double jeopardy grounds prior to the second trial, (2) not seeking to have Deanda W.'s testimony from the first trial barred from being introduced in the second trial on collateral estoppel grounds, and (3) failing to introduce exculpatory evidence through several different witnesses. We will address each argument in turn.

¶ 72    "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 73    In the first ineffective assistance claim at issue, the defendant asserted that trial counsel rendered ineffective assistance by failing to file a motion to dismiss on double jeopardy grounds after his convictions were vacated and that appellate counsel was ineffective in failing to properly argue trial counsel's alleged lapse on direct appeal. The defendant contends that deficient performance is established by the simple fact that his trial counsel confessed in a post-trial motion that she should have moved for dismissal on double jeopardy grounds and that there was no

strategic justification for not doing so. However, counsel's admission alone does not entitle him to relief. Rather, the double jeopardy implications of Deanda W.'s recantation and the vacation of the defendant's convictions were fully explored in the defendant's direct appeal following his second trial. In that decision, we found that the defendant had forfeited the double jeopardy argument by not raising it prior to his retrial, but we also examined and ruled on the merits of the issue and held that double jeopardy did not prohibit the defendant from being tried again. See *Bannister II*, 378 Ill. App. 3d at 30-31 ("Upon consideration of the evidence adduced at the first trial, including the testimony of [Deanda W.], we agree with the trial court's determination that the prosecution had presented sufficient evidence to support defendant's convictions. Accordingly, the defendant's second prosecution did not violate his right to be free from double jeopardy."); see also *People v. Olivera*, 164 Ill. 2d 382, 393 (1995) ("[R]etrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence."). Therefore, the issue is barred by *res judicata*. See *People v. Clark*, 2023 IL 127273, ¶ 41 ("In postconviction proceedings, a defendant's direct appeal is *res judicata* with respect to all issues decided, and the appellate court's judgment generally bars further consideration of those issues in a postconviction proceeding.").

¶ 74 The defendant next asserts that trial counsel rendered ineffective assistance by not seeking to have Deanda W.'s testimony from the first trial barred from being introduced at the second trial on collateral estoppel grounds. See *People v. Jefferson*, 2024 IL 128676, ¶ 36 ("[A] defendant seeking to invoke the doctrine of issue preclusion as embodied within the double jeopardy clause must show that '(1) the issue was raised and litigated in a previous proceeding; (2) that the

determination of the issue was a critical and necessary part of the final judgment in a prior trial; and (3) the issue sought to be precluded in a later trial is the same one decided in the previous trial.' " (quoting *People v. Jones*, 207 Ill. 2d 122, 139 (2003))). He contends that the circuit court's oral findings at the conclusion of his first postconviction proceeding that Deanda W.'s first-trial testimony was "not accurate and truthful" and that the outcome of his first trial "would probably have been different if not for [Deanda W.'s] perjured testimony" amounted to a final judgment that Deanda W.'s first-trial testimony was perjured, and he argues that his trial counsel should have invoked collateral estoppel to prevent the State from presenting that testimony at the second trial.

¶ 75    However, for collateral estoppel to apply, "a decision on the issue must have been necessary for the judgment in the first litigation, and the person to be bound must have actually litigated the issue in the first suit." *Talarico v. Dunlap*, 177 Ill. 2d 185, 191 (1997); see also *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 462 (1996) (" '[I]t is absolutely necessary that there shall have been a finding of a specific fact in the former judgment or record that is material and controlling in that case and also material and controlling in the pending case. It must also conclusively appear that the matter of fact was so in issue that it was necessarily determined by the court rendering the judgment ***.' " (quoting *Lange v. Coca-Cola Bottling Co. of Chicago, Inc.*, 44 Ill. 2d 73, 75 (1969))). Those requirements were not satisfied in the defendant's first postconviction proceeding.

¶ 76    The specific question of whether Deanda W.'s first-trial testimony was perjured and false as a matter of fact was not before the court in the defendant's first postconviction proceeding, and a resolution of that question was not *necessary* to the judgment. Rather, when adjudicating the defendant's actual innocence claim, the court was only tasked with determining whether Deanda

W.'s recantation was sufficiently credible that the outcome of a potential retrial would probably be different. See *Coleman*, 2013 IL 113307, ¶ 96. And that is all that the court ultimately decided. The court was not required to determine whether his trial testimony was in fact false in a manner that would render that statement inadmissible at a future trial, and that issue was not litigated or determined in that proceeding because such a finding was, again, not necessary. Instead, the court found that the defendant had shown that Deanda W.'s recantation created a probability of a different outcome at retrial, and in doing so the court merely made a passing characterization of Deanda W.'s testimony as "perjured," a statement that was at most *obiter dictum*. See *Nationwide Advantage Mortgage Co. v. Ortiz*, 2012 IL App (1st) 112755, ¶ 30 ("[*Obiter dictum*] is a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication." (quoting *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988))). Accordingly, there was no prior determination that could have prevented the State from presenting Deanda W.'s first-trial testimony at the defendant's second trial under the doctrine of collateral estoppel. See *Purchase v. Shawnee Community College*, 2021 IL App (5th) 190296-U, ¶ 44 (holding that a prior court's comments that were not necessary to the judgment did not act to preclude future litigation of the issue under the doctrine of collateral estoppel) (unpublished order under Illinois Supreme Court Rule 23). Therefore, trial counsel did not render ineffective assistance by not seeking to exclude Deanda W.'s first-trial testimony from the second trial on collateral estoppel grounds.

¶ 77     The defendant next contends that the circuit court erred in dismissing his claim that trial counsel was ineffective for failing to introduce exculpatory evidence through several different witnesses. First, the defendant claims that counsel should have called White to testify, as she had

at the first trial, that she saw only five of the codefendants in Tolbert's apartment immediately before and after the shooting of Williams and Kaufman and that the defendant was not among them. Second, he argues that, when Detective Winstead denied having previously stated that from Deanda W.'s alleged vantage point it was impossible for Deanda W. to have seen the position where Deanda W. claimed the defendant was standing, counsel should have impeached Winstead with his contrary testimony from the first trial. Third, the defendant alleges that counsel should have called Andre J. and Meyers to testify that he was not among the group that robbed Andre J.

¶ 78    These claims of ineffective assistance fail for the same reason as the defendant's previous claim: there is not a reasonable probability that the evidence that these witnesses could have provided would have changed the result. White may have seen only five of the codefendants in Tolbert's apartment before and after the shooting, but who she saw in the apartment, away from the scene of the crime, does not necessarily rebut Michael J.'s and Gordon's testimony that there were seven shooters, which Michael J. testified included the defendant. And although Gordon did not identify the defendant as one of the shooters, he testified that he could not see the faces of the two shooters who were behind the pillar on the 3519 side of the breezeway, which is where Michael J. placed the defendant. Further, impeaching Winstead regarding what Deanda W. could see from his viewpoint likewise would not have undermined Michael J.'s account implicating the defendant. And Andre J. and Meyers testifying that the defendant did not participate in the robbery of Andre J. several hours before the shooting of Williams and Kaufman would not have sufficiently weakened Michael J.'s account, which, again, was largely corroborated by Gordon. This evidence may have been helpful to the defendant's case, but in order to succeed on a claim of ineffective assistance of counsel the defendant was required to show that there is a reasonable probability that

the outcome of the trial would have been different, and none of this evidence, even if considered together, would have had that effect.

¶ 79    In his final issue, the defendant challenges the second-stage dismissal of two claims concerning alleged violations of his right to due process. The first of those claims is a recharacterization of an ineffective assistance claim that we have already addressed, with the defendant asserting that, as a matter of due process, his retrial in the wake of Deanda W.'s recantation violated his double jeopardy protections. As in the ineffective assistance claim, the defendant contends that without Deanda W.'s inculpatory testimony there was no remaining evidence of his guilt and that, double jeopardy, therefore, prohibited his retrial. See, *e.g.*, *People v. Lopez*, 229 Ill. 2d 322, 366-67 (2008) ("Retrial *** raises double jeopardy concerns, and we are therefore required to consider the sufficiency of the evidence against defendant."). However, as we addressed earlier, the defendant's conviction was not vacated due to insufficient evidence (*Bannister II*, 378 Ill. App. 3d at 30-31), and double jeopardy, therefore, did not prohibit the defendant's retrial. See *Olivera*, 164 Ill. 2d at 393.

¶ 80    In the second claim, the defendant alleges that, by using Michael J.'s testimony at his second trial, the State knowingly used perjured testimony and violated his right to due process. The defendant further contends that, because this claim was dismissed at the second stage, prior to the evidentiary hearing and the circuit court's rejection of Michael J.'s recantation, we must accept his well-pleaded facts as true, including Michael J.'s assertion that his testimony against the defendant was false and perjured. Essentially, the defendant asks that we go back in time and ignore the circuit court's finding that Michael J.'s recantation was not credible and that Michael J. had testified truthfully at the defendant's second trial. We will not do so.

¶ 81    Even if we assume that it was error to dismiss the claim at the second stage, we conclude that the premature dismissal of the claim was harmless. The primary issue underlying the claim, specifically the veracity of Michael J.'s recantation, was fully explored at an evidentiary hearing, and the circuit court, after hearing Michael J.'s testimony and considering all of the evidence in the case, found that Michael J.'s second-trial testimony was truthful and that his recantation was not, a finding that we affirm in this appeal. We will not ignore the outcome of that hearing and pretend that the credibility of Michael J.'s recantation is still a matter in dispute, particularly when there is nothing to suggest that further litigation of this claim would lead to a different result. Because Michael J.'s recantation has been properly rejected and his second-trial testimony has been found to have been truthful, the defendant's claim that the State knowingly presented perjured testimony at his second trial is, therefore, rebutted by the record and without merit. See *House*, 2023 IL App (4th) 220891, ¶ 77 ("At the second stage, *** all well-pleaded facts that are not positively rebutted by the trial record are taken as true ***.").

¶ 82    For the foregoing reasons, we affirm the circuit court's order dismissing the defendant's petition for postconviction relief.

¶ 83    Affirmed.

¶ 84    JUSTICE OCASIO, dissenting:

¶ 85    In 2004, Michael Johnson was serving a sentence of life without parole. At the time, he was about to start his sixth year of "administrative detention" at the infamous CMAX—the super-maximum security facility at Tamms Correctional Center that the state closed in 2013, ostensibly for budgetary reasons, a facility that a federal judge found to impose such "drastic limitations on human contact *** as to inflict lasting psychological and emotional harm on inmates confined

there for long periods." *Westefer v. Snyder*, 725 F. Supp. 2d 735, 769 (S.D. Ill. 2010), *rev'd on other grounds sub nom. Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) (vacating remedial injunction as overbroad and remanding for entry of new injunction). But that changed when Cook County prosecutors approached him with the deal of the lifetime. Two of his co-accused, James Bannister and Eric Smith, had been granted new trials after the circuit court found that the identification witness the State had relied on at their original trial had lied. They needed Johnson to testify that Bannister and Smith were involved in the killings. In exchange for that testimony, his sentence would be reduced to 60 years on paper and, assuming that he received full day-for-day good-time credit, 30 years in practice. Not surprisingly, Johnson took the deal. Armed with his testimony, the State once again secured convictions against Bannister and Smith. Bannister was sentenced to life without parole.

¶ 86     Then, in 2014, a bombshell. Bannister's postconviction attorney went to Illinois River Correctional Center to interview Johnson about whether he had any information that might help Bannister, whom Johnson knew as Numms. He did, Johnson said, but he wanted to talk to an attorney before putting anything in writing because he was afraid that divulging that information would blow up his plea deal and land him in prison for the rest of his life. But he added, "[O]ff the record[,] the truth is, Numms had nothing to do with it."

¶ 87     A federal court of appeals once observed, "It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987). In this case, the State and Johnson found one: in addition to a reduced sentence, Johnson would get to leave the isolation of his cell at Tamms and serve his time at another facility. When the supreme court affirmed Bannister's conviction after his second trial, it

recognized that Johnson had a powerful motivation to give testimony implicating Bannister, but it rejected Bannister's argument that the State's arrangement with Johnson violated due process. *People v. Bannister*, 236 Ill. 2d 1, 17 (2009). In doing so, it emphasized that the terms of Johnson's deal with the State were put before the trier of fact and that, despite Johnson's motivation to implicate Bannister, the trier of fact nevertheless found him credible. *Id.* at 17-18. But there was one crucial piece of information that the judge who found Bannister guilty in 2004 lacked: according to Johnson himself, his testimony was a lie.

¶ 88     Let there be no illusions about what happened here. The State bribed Johnson to testify that Bannister was involved in the murders. That bribe was legal, and the prosecutors who offered it presumably believed that they were just asking Johnson to tell the truth, but it tainted Johnson's testimony all the same. It also inhibited Johnson's ability to recant. The way the deal was structured, Johnson's original convictions were vacated. He then pleaded guilty to murdering Dan Williams, and the State nol-prossed the charges involving Thomas Kaufman. That agreement barred the State from charging Johnson for Kaufman's murder again, but only so long as Johnson held up his end of the bargain. See *People v. Smollett*, 2024 IL 130431, ¶ 62 ("Because the initial charges were dismissed as part of an agreement with defendant and defendant performed his part of the agreement, the second prosecution was barred."). And in Illinois, there is no statute of limitations for murder: "A prosecution for: *** first degree murder *** may be commenced at any time." 720 ILCS 5/3-5(a) (West 2022); *accord* Ill. Rev. Stat. 1989, Ch. 38, ¶ 3-5 (West). So, even after testifying at Bannister's trial, Johnson was acutely aware that going back on his testimony risked blowing up the deal he had made with the State. Tellingly, he was unwilling to openly recant until his 2019 interview with the head of the Cook County State's Attorney's Office's conviction-

integrity unit, who promised that what Johnson said during that interview would not be used as grounds for undoing the 2004 plea deal.

¶ 89    This should be an easy case. Bannister was convicted based on Johnson's bought-and-paid-for testimony. Regardless of Bannister's actual involvement, Johnson had a compelling motive to implicate him. If he lied, he also had a powerful incentive to keep that to himself for fifteen years. The moment the threat of him losing the benefit of his plea deal went away, Johnson recanted. Actually, he did more than that. He affirmatively stated and then testified that Bannister was not involved. The trier of fact should have heard that evidence. It did not. These are precisely the sort of circumstances that warrant a new trial.

¶ 90    The postconviction court denied that remedy based on its finding that Johnson's inculpatory testimony at Bannister's 2004 trial was credible and that Johnson's recantation was not. The majority holds that this finding was not clearly erroneous and, on that basis, affirms the denial of relief. I do not agree because, whether or not that finding was reasonable, it was the answer to the wrong question.

¶ 91    A claim of newly discovered evidence of actual innocence is cognizable in postconviction proceedings because, as a matter of Illinois constitutional law, due process forbids the imprisonment of an innocent person and requires a new trial when there is newly discovered, compelling evidence of actual innocence. *People v. Washington*, 171 Ill. 2d 475, 487-88 (1996). An actual-innocence claim requires the defendant to produce evidence satisfying four criteria. The evidence must be (1) "new," (2) "material," (3) "noncumulative," and (4) "so conclusive [that] it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96. Johnson's

recantation obviously satisfies the first three criteria. The only contested question is whether Bannister proved that it was sufficiently conclusive as to likely change the result on retrial.

¶ 92    Case law, unfortunately, provides little definite guidance on just how conclusive or how likely to change the result on retrial the new evidence must be to merit relief. It is something less than certainty. See *id.* ¶ 97 ("Probability, not certainty, is the key."). But it must also be something more than a mere possibility. In *Washington*, the court suggested that it is a probability substantial enough that the "legal construct" by which a person convicted in a fair trial is deemed to be guilty is "effectively reduce[d] *** to legal fiction." *Washington*, 171 Ill. 2d at 488. This implies that the appropriate standard is "sufficiently conclusive to undermine confidence in the outcome of the trial." *People v. Davis*, 2012 IL App (4th) 110305, ¶ 64; see *Coleman*, 2013 IL 113307, ¶ 97 (citing *Davis* approvingly); *but see People v. Whalen*, 2020 IL App (4th) 190171, ¶ 101 (disagreeing with *Davis* and observing that, despite citing *Davis* with approval, *Coleman* did not adopt the *Davis* standard). Our supreme court has also described it as "the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *People v. Robinson*, 2020 IL 123849, ¶ 44 (citing *People v. Edwards*, 2012 IL 111711, ¶ 24). But that formulation is itself at odds with *Coleman*, which made clear that the defendant is not required to show that the evidence is insufficient to convict, which would require an *acquittal*, not a new trial. *Coleman*, 2013 IL 113307, ¶ 97 (citing *Washington*, 171 Ill. 2d at 497 (McMorrow, J., concurring)).

¶ 93    What is clear is that the inquiry is directed toward assessing the range of possible outcomes at a retrial, not determining whether the postconviction court would acquit or convict based on the new evidence. *Id.* ("[T]he trial court should not redecide the defendant's guilt in deciding whether

to grant relief.") The question, in other words, is not whether the postconviction court personally believes that the new evidence of innocence is credible. The court's job is to merely evaluate how likely it is that the new evidence would lead to an acquittal at a retrial. *Id.* ¶ 96 ("[C]onclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result."). Doing so obviously requires the court to evaluate credibility (*id.* ¶ 97), but from the perspective of potential jurors, some of whom might not agree with the judge's personal assessment.

¶ 94     Here, once the court determined as a matter of historical fact that Johnson's recantation was new, material, and noncumulative, its task was to assess "whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 96. But rather than asking how likely it was that Bannister would be acquitted at a new trial, the court asked which of Johnson's stories *it* believed, personally, and decided to credit the one implicating Bannister: "For all of the above reasons, this court is convinced that Michael Johnson's initial statements he made that were against his penal interest in 1989 were truthful." The court, in short, determined that because one potential trier of fact— itself—would convict Bannister despite Johnson's new testimony, Bannister would not be given the opportunity to defend himself at a criminal trial where *all* of the evidence would be before the trier of fact, including Johnson's recantation and his affirmative testimony that Bannister was not involved. Essentially, the postconviction court improperly adjudicated Bannister's guilt at a third-stage postconviction hearing. See *id.* ¶ 97.

¶ 95     Usually, an error of this nature would call for a new evidentiary hearing. Under the circumstances of this case, though, that would be a pointless exercise because the evidence before

the postconviction court permitted only one reasonable conclusion, which is that Bannister is entitled to a new trial.

¶ 96    To be blunt, I simply cannot fathom how one could reasonably conclude that Johnson's recantation does not, at minimum, place the trial evidence in such "a different light" as to undercut confidence in the original verdict. *Id.* Johnson's testimony that Bannister was involved in the murders was not one of many facts establishing guilt. To the contrary: it was utterly essential to the State's case. We recognized as much on direct appeal when we sustained Bannister's conviction based on Johnson's testimony, relegating the other trial evidence to mere corroboration. See *People v. Bannister*, 378 Ill. App. 3d 19, 40 (2007). The newly discovered evidence is Johnson's affirmative testimony that Bannister was, in fact, *not* involved. In 2004, Johnson told the trier of fact that he was telling the truth despite his remarkable plea deal. Now, he has testified that he lied in 2004 because that's what he had to do to get that deal. How does that not put the trial evidence in a different light?

¶ 97    Even if you do not believe Johnson's recantation, as the postconviction court chose not to, his explanations for his previous inconsistent statements and testimony are hardly implausible. The possibility that he lied in 2004 so he could get the benefits on offer is obvious. His explanation for implicating Bannister in 1989 was that the police presented him with seven photographs depicting the seven individuals the police believed were involved. Six of those photographs—including one of himself—were of people that Johnson maintains to this day were involved. Rather than quibble over whether the seventh person, Bannister, was involved, Johnson calculated that his own chances would be better if he went along with the "script" being set out in front of him. Johnson's statements over the years have changed, but one thing has stayed the same: every time he opens

his mouth, what comes out is consistent with his self-interest. In 1989, he thought it would be better for him to give the police a false alibi, so that's what he did. Once the police discredited that alibi, he thought it would be better for him to confess and implicate the six other people the police thought were responsible, so that's what he did. Later, after he was charged, he thought it would better for him to try getting his confession thrown out by concocting a lie that he was not given the *Miranda* warnings, so that's what he did. In 2004, he thought it would be better for him to tell the State what they wanted to hear, so that's what he did. In 2014, he thought it would be better for him to refrain from recanting "on the record," so that's what he did until 2019, when an assistant state's attorney promised him that what he said would not be used to unwind the plea agreement. The only mystery is why he believes that recanting is now in his best interests. One can speculate, but there is no evidence suggesting that he has a motive to falsely recant.

¶ 98    I could go on at some length about the reasons to believe that Johnson's recantation is the truth. I could also discuss the reasons to think that it is a lie. But doing either would undermine the point: a final determination about which of Johnson's contrary statements is the truth is dispositive of Bannister's guilt, so that is a question that is reserved for the trier of fact at a criminal trial where the State has the burden of proving guilt beyond a reasonable doubt. It is not a question that is meant to be definitively answered by the judge at a postconviction evidentiary hearing where the burden of proof is on the defendant. *Coleman* clearly instructs that a postconviction court "should not redecide the defendant's guilt" at the third-stage hearing. *Coleman*, 2013 IL 113307, ¶ 97. The postconviction court's role is limited to deciding whether " 'all of the facts and surrounding circumstances should be scrutinized more closely to determine [the defendant's] guilt or innocence.' " (Alteration marks in *Coleman* removed.) *Id.* (quoting *People v. Molstad*, 101 Ill. 2d

128, 136 (1984)). The only reasonable view of the evidence adduced below is that this case demands closer scrutiny. An essential identification witness who had a powerful motive to implicate Bannister, truly or falsely, has now plausibly recanted. If that plausible recantation is believed, it means that Bannister is actually innocent of the double murder for which he is serving a life sentence. And the likelihood that a trier of fact would believe that recantation or, at least, harbor reasonable doubt about Bannister's guilt because of it, is substantial enough to merit a new trial regardless of the postconviction judge's personal belief. The postconviction court's determination was manifestly erroneous. By affirming, the majority denies Bannister his right to due process of law under our state's constitution. Ill. Const., 1970, art. 1, § 2; *Washington*, 171 Ill. 2d at 488-89. I respectfully dissent.