Docket No. 92843–Agenda 2–September 2003.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SAMUEL MORGAN, Appellant.

Opinion filed September 23, 2004.

JUSTICE RARICK delivered the opinion of the court:

This matter is before the court on appeal from a judgment of the circuit court of Cook County denying a successive petition for postconviction relief filed by defendant, Samuel Morgan, based on newly discovered evidence. Defendant argued that the new evidence, particularly the recanted testimony of an eyewitness, established that he was actually innocent of the crimes for which he had been convicted. The circuit court denied defendant’s claim after conducting an evidentiary hearing. We now affirm.

The legal proceedings underlying this case began in 1983, when a jury convicted defendant of murdering William Motley and Kenneth Merkson and of raping and the aggravated kidnapping of Phyllis Gregson. Defendant received a death sentence for the murders and prison terms for the remaining convictions. On direct appeal, we affirmed all of defendant’s convictions and his sentence of death, but reduced his sentences for aggravated kidnapping and rape. 
People v. Morgan
, 112 Ill. 2d 111 (1986), 
cert. denied
, 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329 (1987).

Defendant subsequently filed a petition under the Post-Conviction Hearing Act (725 ILCS 5/122–1 
et seq.
 (West 1994)) challenging his convictions and death sentence. The circuit court denied that petition following an evidentiary hearing. On review of the circuit court’s judgment, we affirmed defendant’s convictions, but held that errors by defense counsel during the aggravation-mitigation phase of the sentencing proceedings raised a serious doubt as to the propriety of defendant’s death sentence. We therefore vacated the death sentence and remanded the cause to the circuit court for a new sentencing hearing. 
People v. Morgan
, 187 Ill. 2d 500 (1999).

While the matter was pending on remand to the circuit court, defendant brought an additional challenge to his convictions and sentences. As grounds for that challenge, defendant asserted that newly discovered evidence demonstrated that he was actually innocent of the crimes for which he had been convicted in 1983. Defendant sought relief under both the Post-Conviction Hearing Act and section 2–1401 of the Code of Civil Procedure (735 ILCS 5/2–1401 (West 2000)). The gravamen of his new claim, which is the one before us today, was that Elijah Prater, one of the two principal witnesses at the 1983 trial and the only eyewitness other than defendant still alive, had recanted his testimony. According to an affidavit executed by Prater, one of the two victims had actually been killed by the other, not by defendant, and although defendant had killed the second victim, he had done so out of self-defense.

Following an evidentiary hearing, the circuit court denied defendant’s request for relief. Uncertain as to the proper forum in which to obtain review of the circuit court’s judgment, defendant filed notices of appeal with both our court and the appellate court. On the State’s motion, and without objection by defendant, our court entered an order pursuant to Rule 302(b) (134 Ill. 2d R. 302(b)) specifying that the appeal was to be taken directly to us.

While the appeal was pending, the Governor commuted defendant’s death sentence. Under the terms of the commutation, defendant’s sentence was “Commuted to a Sentence Other Than Death for the Crime of Murder, So that the Maximum Sentence that may be imposed is Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief.” The State challenged the validity of this and other commutations, but its challenge was unsuccessful. 
People ex rel. Madigan v. Snyder
, 208 Ill. 2d 457 (2004). On the court’s own motion, and in the interest of judicial economy, we elected to retain jurisdiction of the case. Briefing was concluded and oral argument was held. The matter is now before us for a decision on the merits.

How we undertake our review is defined by the procedural posture in which the case has come before us. As our summary of the proceedings has indicated, this is not a direct appeal. It is an appeal from a judgment denying relief under the Post-Conviction Hearing Act. To be entitled to relief under the Act, a defendant must demonstrate a substantial deprivation of federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. Not every constitutional violation can be challenged, however. 
Res judicata
 and the waiver doctrine limit postconviction relief to constitutional matters which have not been and could not have been adjudicated earlier. 
People v. Jones
, 211 Ill. 2d 140, 143-44 (2004), quoting 
People v. McNeal
, 194 Ill. 2d 135, 140 (2000).

Consistent with these principles, the Post-Conviction Hearing Act contemplates the filing of only one postconviction petition. 
People v. Lee
, 207 Ill. 2d 1, 5 (2003). Under the express terms of the statute, “[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.” 725 ILCS 5/122–3 (West 2000). This rule would normally be fatal to a successive postconviction petition such as the one before us today. Our court has held, however, that the statutory bar to a successive postconviction petition will be relaxed when fundamental fairness so requires. 
People v. Lee
, 207 Ill. 2d at 5. It is this exception on which the viability of defendant’s new petition depends.

To establish that fundamental fairness requires that a successive postconviction petition be considered on the merits, a defendant must show both cause and prejudice with respect to each claim presented. More precisely, the defendant must show good cause for failing to raise the claimed error in a prior proceeding and that actual prejudice resulted from the error. 
People v. Lee
, 207 Ill. 2d at 5. For purposes of this test, “cause” has been defined as an objective factor external to the defense that impeded counsel’s efforts to raise the claim in an earlier proceeding. 
People v. Pitsonbarger
, 205 Ill. 2d 444, 460 (2002). “Prejudice” exists where the defendant can show that the claimed constitutional error so infected his trial that the resulting conviction violated due process. 
People v. Tenner
, 206 Ill. 2d 381, 393 (2002).

Acknowledging “the seriousness of an actual innocence claim in a potentially capital case,” the State did not dispute that defendant met the cause and prejudice test and that fundamental fairness justified an evidentiary hearing on defendant’s successive postconviction petition. The State’s position in the circuit court and now on appeal is that defendant simply failed to substantiate his claims. After careful review of the record and the applicable law, we agree.

The conviction of an innocent person violates the due process clause of the Illinois Constitution. Our court has therefore recognized the right of postconviction petitioners to assert a claim of actual innocence based on newly discovered evidence. 
People v. Washington
, 171 Ill. 2d 475, 489 (1996). To win relief under that theory, the evidence adduced by the defendant must first be “newly discovered.” That means it must be evidence that was not available at defendant’s original trial and that the defendant could not have discovered sooner through diligence. The evidence must also be material and noncumulative. In addition, it must be of such conclusive character that it would probably change the result on retrial. 
People v. Barrow
, 195 Ill. 2d 506, 540-41 (2001).

In the case before us, defendant’s claim of actual innocence is predicated on the decision by Elijah Prater, an eyewitness to the murders for which defendant was convicted, to recant incriminating testimony he had given at defendant’s original trial. The recantation occurred 18 years after the killings took place and 17 years after defendant was tried and convicted. The State does not dispute that Prater’s recanted testimony was not available at defendant’s original trial and that the defendant could not have discovered it sooner through diligence. Nor does the State question the material, noncumulative nature of the evidence. In the State’s view, the flaw in defendant’s claim is that the evidence was not of such conclusive character that it would probably change the result on retrial. This argument is well taken.

The recantation of testimony is regarded as inherently unreliable. As a result, the courts will not grant a new trial on that basis except in extraordinary circumstances. 
People v. Steidl
, 177 Ill. 2d 239, 260 (1997). No such circumstances are present here.

As it considered defendant’s postconviction claim for a new trial, the circuit court was duly mindful of the law’s skepticism of recanted testimony. The court held an evidentiary hearing at which Prater testified. It observed Prater’s demeanor and assessed his new testimony against the facts and circumstances previously established at trial. In the end, the court concluded that Prater’s new testimony was not credible.

Where, as here, the circuit court has held an evidentiary hearing on a postconviction petition at which the court was required to consider new evidence and weigh the credibility of witnesses, we will disturb the circuit court’s judgment only if it is manifestly erroneous. Manifest error is error which is “ ‘clearly evident, plain, and indisputable.’ ” 
People v. Johnson
, 206 Ill. 2d 348, 357-60 (2002), quoting 
People v. Ruiz
, 177 Ill. 2d 368, 384-85 (1997). We discern no such error here.

The facts adduced at defendant’s original trial have been detailed by this court previously. See 
People v. Morgan
, 112 Ill. 2d 111 (1986); 
People v. Morgan
, 187 Ill. 2d 500 (1999). According to the evidence presented to the jury, Elijah Prater was defendant’s long-time friend. Defendant went to Prater’s apartment on the afternoon of January 27, 1982, accompanied by Motley and Merkson, who were also his friends. The four men used various drugs and alcohol. They were subsequently joined by Phyllis Gregson, who was a friend of Prater.

The group spent the night at Prater’s apartment. Just before noon the following day, Motley, Gregson and defendant were in the apartment’s front room. Motley was sitting on a couch, talking on the telephone, and looking through a small, black telephone book. As he

was making phone calls, Motley had a .357 Magnum handgun tucked under his leg. Defendant was sitting on a chair with a shotgun across his lap. Prater and Merkson were in the kitchen.

Defendant instructed Gregson to remove her clothing and dance for him. Gregson refused. Motley, who was still sitting on the couch, made an unknown comment to defendant. Defendant, who was between six and seven feet away from Motley, aimed the shotgun at him and fired. Motley landed on the floor with a fatal shotgun wound to the chest. Defendant then removed the handgun from Motley’s body and placed the gun in his own waistband.

Defendant went into the kitchen and told Prater and Merkson to come into the front room and clean up Motley’s body. Merkson removed money, marijuana, and the black telephone book from Motley and gave them to defendant. Defendant looked at the names in the book, asked if anyone knew the listed individuals, and then placed the book in his pocket. Defendant said that he wanted to get

Motley’s body out of the apartment and told Prater and Merkson to pull the drawer out of a bedroom dresser to determine if the body would fit inside. Although Motley’s body was bent and tied with a rope, the dresser drawer would not accommodate the body. Prater and Merkson then stuffed Motley’s tied body into a laundry bag and wrapped it inside a mattress. Defendant instructed Gregson to clean Motley’s blood from the floor, which she did.

Shortly thereafter, defendant sent Prater to a liquor store to buy something to drink, told Prater to put gas in Prater’s car, and instructed him to park the car at the rear of the apartment building. Prater ran the errands and returned to the apartment approximately 15 minutes later. Upon Prater’s return, Gregson was washing dishes in the kitchen, and defendant was sitting in the dining room with the shotgun in his lap and the handgun tucked into the waistband of his pants. Merkson was walking around the apartment making jokes.

Prater gave defendant the liquor he purchased and the men took a few drinks. Merkson continued to make jokes until defendant told him to stop joking and to remove Motley’s body from the apartment. Merkson and Prater then moved Motley’s body, wrapped inside the mattress, to the center of the room.

When Merkson made another remark, defendant chased Merkson into the front room, where they started to argue. After hitting Merkson in the head with the butt of the handgun, defendant again instructed Merkson and Prater to remove the body from the apartment. Merkson made another remark to defendant and defendant told Merkson to get down on his knees and face the floor. Prater testified that he saw defendant point the handgun at Merkson’s head from a distance of four to five feet. Prater then turned to face the wall. Prater testified that he heard a shot and turned back to see Merkson’s body on the floor with defendant, holding the handgun, standing beside it. Gregson also testified that as she emerged from the kitchen she saw the handgun in defendant’s hand as he stood near Merkson’s body.

Defendant ordered Gregson to clean up Merkson’s blood, and instructed Prater to get the body out of the apartment. As Prater began to tie up Merkson’s body with his belt, defendant came up behind Prater and began shooting at him. Prater testified that he felt a bullet pass by his head. Prater then ran through the kitchen and out the back door of the apartment.

Defendant, who was now alone with Gregson in the apartment, ordered her into the bathroom. Gregson complied, and locked the bathroom door behind her. After the passage of between 5 and 10 minutes, defendant ordered her out of the bathroom. When she emerged, she saw defendant was still in possession of the handgun, although she did not observe the shotgun. Defendant took Gregson by the arm and they left the apartment together at approximately 1:30 p.m.

While this was taking place, Prater’s downstairs neighbor, Frank Blume, called the police. Blume, who had heard several loud shattering sounds coming from Prater’s apartment during the morning, testified that the last loud blast, which occurred at about 1:15 p.m., caused a hole in the ceiling in Blume’s front hallway.

The police arrived on the scene shortly after 1:30 p.m. Upon entering Prater’s apartment, they discovered the bodies of Motley and Merkson. In the course of examining the scene, the police recovered a loaded shotgun, a fingerprint from a dresser drawer later identified as defendant’s, and a bullet from the floor. The police also recovered a bullet from Blume’s apartment.

Gregson testified that after leaving Prater’s apartment, defendant, who was still armed with the handgun, ordered her into his car and drove her to the South Shore Motel, where he checked in under the alias of Joseph Thurston. Defendant, who had Gregson by the arm, then led her to a motel room, where he began to undress her. Although Gregson told defendant that she did not want to have sex with him, defendant completed removing her clothes, pushed her onto the bed, and had sexual intercourse with her.

Thereafter, defendant, still armed with the handgun, escorted Gregson by the arm to his car. A motel employee testified that he observed defendant pointing a gun to Gregson’s head. Upon seeing the employee, defendant aimed the gun at him and began chasing him. As the employee ran towards the motel lobby, defendant ceased the chase, again took Gregson by the arm, and pushed her headfirst into his car. Soon thereafter, defendant stopped the car and told Gregson to get out. After warning her not to tell anyone what had happened, defendant drove off at a rapid rate of speed.

Defendant was arrested the following day. Later that same day, Prater contacted the police and informed them that defendant was responsible for the deaths of Merkson and Motley. Prater’s statements to the police were subsequently confirmed by Gregson.

Prater gave his account of the events leading to the deaths of Merkson and Motley, under oath, on multiple occasions in the years that followed. Approximately 18 years after the killings took place, Prater’s story suddenly changed. Under Prater’s new version of the crime, which he presented at the evidentiary hearing on defendant’s successive postconviction petition, Motley and Merkson got into an argument while they were at his apartment. Motley struck Merkson with the .357 Magnum handgun he had been carrying, then used the weapon to shoot Merkson in the head. Gregson screamed. Motley turned toward defendant and Prater, pointing the handgun at them. Defendant then shot and killed Motley in self defense.

It was at this point, after both Merkson and Motley were both dead, that Prater now claimed that he left the apartment to get gas for the car and to buy liquor. On his return, Prater helped tie up the bodies of Motley and Merkson for disposal and to clean up the mess. Defendant then shot at Prater and, as in Prater’s original version, Prater fled.

According to Lemuel Bell, a friend of Prater who was called as a witness at the hearing on the successive postconviction petition, but not at the original trial, Prater telephoned him and told him that Motley had shot Merkson in his apartment and that defendant had “saved the day” by shooting Motley. Prater subsequently surrendered to police. Prater now claims he attempted to tell the same version of the story to police interrogators, but was coerced into changing his story to implicate defendant.

In urging the circuit court to adopt Prater’s current story and to reject the sworn testimony Prater has given in the past, defendant argued that the new version was more consistent with a number of pieces of physical evidence. These include the lack of blood or other bodily fluid on or near the couch on which Motley had been sitting, evidence that Merkson was shot from a distance of at least 18 inches, the presence of defendant’s fingerprint on a dresser drawer in Prater’s apartment, and the fact that defendant was found in possession of the .357 Magnum handgun and ammunition and the book Motley had been looking through while seated on the couch.

The circuit court rejected these arguments. It noted that the absence of blood and other bodily fluids on the couch could be explained by testimony given at trial by Gregson that Motley’s body flew off the couch and landed on the floor nearby after he was shot by defendant. Although pools of bodily fluids were later found farther from the couch than that, evidence at trial indicated that Prater and Merkson had moved Motley’s body after Motley was shot and killed.

The forensic evidence indicating that the shot which killed Merkson was fired from a distance of at least 18 inches likewise did not contradict evidence at the original trial. To the contrary, it was consistent with Prater’s original testimony that defendant was four or five feet from Merkson when he shot him. The same is true of the other elements of physical evidence cited by defendant: the fingerprint, the gun and ammunition and the book. Those items did fit in with Prater’s new story, but they were also fully consistent the sworn testimony that he had given in the past. As a result, they did not demonstrate that Prater’s new testimony was any more credible than the previous testimony he now attempted to recant.

In further support of Prater’s new version of events, defendant argued that it provides a more plausible explanation of Prater’s departure and return to the apartment. Plausibility, however, is not the test. The question is whether the new evidence was sufficiently compelling that a decision by the trial court to reject that evidence in favor of the original testimony was manifestly erroneous. That is clearly not the case here. Prater’s original explanation for his decision to leave the apartment and return made sense too, and nothing brought to light since the trial suggests that the circuit court erred in refusing to jettison Prater’s original explanation in favor of the new rationale he offered.

We reach a similar conclusion with respect to testimony presented at the postconviction hearing by Prater’s girlfriend, Cynthia Ruwe, and by defendant’s former girlfriend, Rosemary Thomas. These witnesses testified regarding matters that occurred at the police station after Prater was in custody, and their testimony was intended to buttress defendant’s claim that his original testimony was the product of police coercion. Without going into the specifics of their testimony, we note that neither of these witnesses was independent. They both had personal relationships with Prater or defendant. Moreover, their testimony and the testimony of Prater regarding his interaction with the police following the killings was contradicted by police officers and an assistant State’s Attorney who were directly involved in the case. The trial court believed those witnesses. Indeed, it found their testimony to be “compelling, credible, convincing and unimpeached on any material point.” It therefore concluded that “there is no credible evidence that *** Prater was ever coerced by anyone to give false testimony against [defendant] at any time.” Credibility determinations of this kind were for the trial court to make, and we have no basis in the record before us for second-guessing its judgment.

Defendant argues that before the trial court deferred to the credibility of the police officers and rejected Prater’s claim that he had been coerced, it should have considered evidence that the officers had coerced a different defendant in another, unrelated case several years later. This argument must also fail. The circuit court has wide discretion to limit the type of evidence it will admit at a postconviction evidentiary hearing. 
People v. Coleman
, 206 Ill. 2d 261, 278 (2002). The incident in the other case was distinguishable from this one. It involved a situation where the police denied a defendant access to his attorney, continued to question the defendant after he requested counsel, and subjected him to physical abuse. Unlike the defendant in that case, Prater was not denied access to his attorney, was not questioned after he asked for his attorney, and suffered no physical abuse. The defendant in the other case was beaten. Prater’s contention was that he was kept handcuffed and had his clothes taken from him. Given these differences, we cannot say that the circuit court abused its discretion when it refused to admit the evidence from the other case.

In 
People v. Burrows
, 172 Ill. 2d 169, 188 (1996), this court affirmed a circuit court’s decision in a postconviction proceeding to award a new trial based on, 
inter alia
, the recantation of incriminating testimony by one of the State’s prime witnesses. One factor that impressed this court was that the witness in 
Burrows
 did not merely recant her testimony. She made self-incriminating admissions, under oath, that placed the blame for the killing on her and exonerated the defendant of any involvement in the murder. Nothing of that magnitude is present here. Prater’s new testimony does not implicate him in the murders, nor does it subject him to any significant additional threat of prosecution for any other offense. 
There was apparently no realistic possibility of a perjury prosecution, and while Prater may have opened himself to a charge of concealment of the homicidal deaths of Motley and Merkson, that was also true of his prior testimony in the case.

We note, moreover, that Prater was not the only eyewitness to the murders of Motley and Merkson. As we discussed earlier in this opinion, the murders were also witnessed by Phyllis Gregson. Gregson testified at defendant’s original trial. In the ensuing years, up until the time of her death, there was no indication that Gregson ever waivered in her belief that defendant was responsible for murdering both of the victims.

Faced with Gregson’s testimony and its incompatibility with the version of events now offered by Prater, defendant attempted to impeach Gregson’s credibility by arguing that Gregson may have lied at trial in order to obtain favorable treatment from the State on various unrelated criminal charges filed against her shortly after the crimes were committed. Defendant also attacked Gregson’s credibility by questioning the strength of the evidence supporting her claim that she was sexually assaulted and by offering evidence that she was convicted of several criminal offenses many years after the events giving rise to this case.

These attempts were properly rejected by the circuit court. In assessing the strength of Gregson’s testimony, the salient issue was her credibility at the time of the original trial. Her subsequent legal entanglements have no discernible relevance to that issue. If they demonstrate anything, it is that the life she led after being raped and kidnapped by defendant was an unfortunate one. They do not make it any more or less likely that she was telling the truth when she took the stand against defendant in 1983. As for the strength of the evidence corroborating the sexual assault committed against her by defendant, that was for defense counsel to argue and for the jury to consider when the case was tried. It does not constitute newly discovered evidence and there is no reason it could not have been fully explored on direct review.

More problematic is the disposition of the unrelated criminal charges filed against Gregson shortly after the murders. There were two arrests. The first, for possession of a controlled substance, was nol-prossed by the State. The second, for possession of illegal drugs, apparently resulted in a sentence of six months’ supervision. Such information should have been disclosed to defense counsel at the time of trial, but was not. Once again, however, we note that there is no apparent reason this problem could not have been explored and raised earlier in the history of these proceedings. The records invoked by defendant have been on file for two decades.

In addition, the actual significance of the criminal charges is questionable. Defendant looks to those charges and the way they were disposed of by the State as providing a motive for Gregson’s decision to incriminate defendant. As the State points out, however, Gregson had a much more compelling and entirely legitimate motive for testifying against defendant. She did not do it to garner a favorable disposition of her drug charges. She did it because defendant had kidnapped and raped her, and she wanted insure that he was punished.

While Prater’s recanted testimony challenged defendant’s role in the murders, it did nothing to weaken the State’s case against defendant for the rape and aggravating kidnapping of Gregson. Her testimony was corroborated at trial by other evidence, including the testimony of a clerk at the hotel where defendant raped her. Any notion that Gregson’s testimony was actually the product of some improper, ulterior motive is nothing more than unsubstantiated speculation.

In the end, defendant’s postconviction petition turned on a single factor: the credibility of Elijah Prater. Here, as in every case of this kind, it was for the trial court to assess the credibility of the recantation testimony after having observed the demeanor of the witness. The trial judge studied the record, listened to Prater’s testimony, and watched how he reacted when he was questioned and cross-examined. Based on our examination of the record, we cannot say that the trial judge’s decision to reject Prater’s recanted testimony was manifestly erroneous.

In support of his claim for postconviction relief, defendant raises the additional claim that the State violated his due process rights. He also argues that the circuit court erred in not granting him relief under section 2–1401 of the Code of Civil Procedure. Both of these arguments are premised on the assumption that Prater’s original trial testimony was perjured and that his new testimony was honest. The trial court rejected that assumption, holding that the new testimony was not credible. In view of our conclusion that the trial court’s decision to reject Prater’s recanted testimony was not manifestly erroneous, defendant’s additional arguments cannot be sustained.

For the foregoing reasons, the judgment of the circuit court denying defendant’s successive postconviction petition is affirmed. The State’s motion to dismiss the appeal, which was taken with the case, is hereby denied. Upon issuance of this court’s mandate, the stay of new sentencing proceedings previously ordered by our court shall be lifted.

Affirmed.