2025 IL App (1st) 240351-U

FOURTH DIVISION
Order filed: May 15, 2025

No. 1-24-0351

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 10291 |
| | ) | |
| LARRY WILLIAMSON, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The circuit court's denial of the defendant's successive petition for postconviction relief raising a claim of actual innocence was manifestly erroneous when newly discovered evidence contradicted the State's evidence of guilt at trial and identified someone other than the defendant as the perpetrator of the offense for which the defendant was convicted.

¶ 2  Following a third-stage evidentiary hearing, the defendant, Larry Williamson, appeals the denial of his successive petition for postconviction relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). In the petition, the defendant raised a claim of

actual innocence based on newly discovered evidence from a previously unidentified witness who averred that he would testify that someone other than the defendant committed the murder for which the defendant was convicted. After the third-stage hearing, the circuit court found that the defendant had failed to demonstrate that the new evidence was material, noncumulative, and conclusive. Because the circuit court's rulings on those issues conflict with determinations that this court made in a prior appeal involving the defendant's petition, as well as supreme court precedent, we reverse the denial of the defendant's petition, vacate his conviction, and remand the cause to the circuit court for a new trial.

¶ 3    The defendant was convicted of first-degree murder for the shooting death of Dimitri Wilson. The evidence adduced at trial generally established that, at approximately 8:30 p.m. on June 6, 2005, Wilson was shot and killed near the corner of 75th Street and Colfax Avenue after engaging in an argument with an individual. The evidence specifically implicating the defendant consisted entirely of prior statements and grand jury testimony from three witnesses who each recanted their respective pre-trial accounts at the defendant's trial. No physical evidence linked the defendant to the murder.

¶ 4    At trial, Herman Fordman testified that he rode his bicycle to a liquor store at 75th Street and Colfax Avenue on the evening of the shooting. According to Fordman, many people were out that night, and there was a lot of traffic on 75th Street. He was leaving the store at approximately 8:30 p.m. when he observed a verbal altercation between two people. As he was riding westbound on 75th Street, he heard three gunshots coming from behind him. Fordman testified that he did not know the people who were involved in the altercation, and he did not see from where the shots had

been fired. After hearing the gunshots, Fordman continued riding his bicycle to his grandmother's house.

¶ 5    The following day, Fordman was arrested on a drug charge. While at the police station, the detectives asked him about the shooting and showed him an array of six photographs, which included pictures of the defendant and Wilson. From those photos, Fordman identified the defendant and Wilson as the individuals involved in the altercation, but he did not know either of them at the time. Fordman further testified that, after identifying the defendant, he was released without being charged with the drug offense. Fordman stated that he never saw the defendant with a gun and never saw him shoot Wilson.

¶ 6    Fordman acknowledged that in January 2006, he was brought back to the police station and signed a written statement taken by Assistant State's Attorney (ASA) James Murphy. In that statement, Fordman indicated that he knew both Wilson and the defendant from the neighborhood, but he did not know their names. According to Fordman's statement, at about 8:30 p.m. on June 6, 2005, he left the liquor store located at 75th Street and Colfax Avenue and then saw Wilson arguing with the defendant. Fordman's statement further indicated that he looked back as he was riding away because he thought the men might fight. He saw Wilson put his hands up in front of his face and heard gunshots. According to his statement, Fordman did not see a gun, but he did see flashes come from where the defendant was standing. Fordman's written statement also acknowledged that he was giving the statement freely and voluntarily and that no threats or promises were made to him in exchange for his statement.

¶ 7    When questioned about his written statement at trial, Fordman admitted that he signed the bottom of each page of the statement, initialed certain corrections, and signed the photographs of

Wilson and the defendant, which were attached to the statement as exhibits. He testified, however, that he did not read the statement before signing it. He also denied that he told the ASA the information that was contained in the statement and denied that no threats or promises were made in return for his statement. Fordman admitted that he was subsequently convicted of a narcotics offense and that, at the time of trial, he was serving a four-year sentence for that conviction.

¶ 8    ASA Murphy testified that, on January 26, 2006, he interviewed Fordman, who gave an oral statement describing the events he witnessed on the night of the shooting. Fordman later agreed to have his statement memorialized in writing. Murphy testified that he asked Fordman questions about the shooting and wrote a summary of Fordman's answers. At trial, Murphy recounted the substance of the written statement and testified that Fordman reviewed the completed document before signing each page, including the photographs of Wilson and the defendant. Murphy further testified that Fordman expressly agreed that no threats or promises were made in exchange for the statement and that it was made freely and voluntarily.

¶ 9    Donald Epps testified that he had known both Wilson and the defendant for more than 10 years. According to Epps, he was standing in the doorway of the liquor store at 75th Street and Colfax Avenue when he saw Wilson pull up in his Cadillac and say something as he approached a group of people that included the defendant. Epps stated that he then heard gunshots and saw Wilson on the ground. He did not see anything else because, when the shots were fired, he ran away with everyone else who was on the street. In addition, Epps stated that he had been drinking alcohol and smoking marijuana that night and that he was standing across the street from where the shooting occurred. Epps also acknowledged that he has no vision in his left eye.

¶ 10    Epps further testified that he was arrested on a drug charge on December 18, 2005, and was interviewed by ASA Kim Ward at the police station. Epps acknowledged that, following the interview, Ward asked him a series of questions and wrote down his answers. Epps further admitted that he signed the written statement prepared by Ward and subsequently testified before the grand jury. Epps' written statement and his grand jury testimony indicated that he saw Wilson pull up in his Cadillac, approach the defendant, and ask the defendant if he wanted to "box," which meant to fist fight. Wilson, who was standing approximately five feet from the defendant, started to back away and turn around when the defendant shot at him about six times. Wilson began to run but then fell and tried to crawl back to his car. The defendant ran to a van and drove off with his girlfriend. In his written statement, Epps acknowledged that he had been arrested for a drug offense, and he stated that no threats or promises had been made regarding that case to induce him to make the statement, which was given freely and voluntarily. In addition, Epps testified before the grand jury that he had not been threatened or promised anything in exchange for his testimony.

¶ 11    At trial, Epps identified the written statement he gave to ASA Ward and admitted that his signature appeared on each page. He also admitted that he had identified a photograph of the defendant as the person who shot Wilson and that he signed that photograph, which was attached as an exhibit to his written statement. Yet, when questioned about the substance of his written statement and his grand jury testimony, Epps denied that the information contained in his prior statements was true. According to Epps, ASA Ward told him that she would "drop" the drug charge if he signed a statement inculpating the defendant, but she later reneged on her promise, and the drug charge was not dismissed. Epps stated that he was convicted of that drug offense and

sentenced to a term of probation. In addition, he was simultaneously convicted on a separate narcotics charge and sentenced to a prison term of four years.

¶ 12    Jennifer Jackson testified that the defendant was her former boyfriend and the father of her four-year-old daughter. Though the two had broken off their relationship in early May 2005 and were no longer dating at the time of the shooting, they continued to see each other when the defendant visited with their daughter. Jennifer testified that, at about 4:30 p.m. on June 6, 2005, she was at a store located at 75th Street and Colfax Avenue. She was accompanied by her two daughters, her sister, her brother, and two of her cousins. Jennifer stated that, as they were leaving the store, she heard several gunshots. Upon hearing the gunfire, she immediately ran home along with her daughters. Jennifer denied seeing the defendant in the vicinity of the shooting when she heard the gunshots, and she stated that she did not know who fired the shots. She also denied that the shooting had occurred during the evening hours and stated that she was at home at 8:30 p.m. that night.

¶ 13    Jennifer further testified that in April 2006, she was 21 years old and was six months pregnant with the child of a former boyfriend, not the defendant. According to Jennifer, the police came to her house on April 1, 2006, and left a card with her brother. When she called the telephone number on the card later that night, a police officer asked whether she would come to the station and pick up some of the defendant's things because he had been arrested the previous day. She agreed, and an officer picked her up at about 11 p.m. Jennifer stated that she was at the police station for approximately five hours and was periodically questioned about the shooting. Jennifer testified that she did not know Wilson and learned his identity from the detectives who showed her his picture while they were questioning her. In addition, Jennifer repeatedly testified that she

initially told the detectives that she had not witnessed the shooting. She acknowledged, however, that she later signed a written statement and gave testimony before the grand jury, both of which implicated the defendant in the shooting.

¶ 14    Jennifer's written statement was taken by ASA Michael Clarke and indicated that, on June 6, 2005, she was at 75th Street and Colfax Avenue, where she saw the defendant standing outside of the post office. She also saw a man, whom she later learned was Wilson, walking on 75th Street. According to Jennifer's written statement, she saw Wilson walk to his car and make a motion like he was getting something, but she could not see what it was. She did not see Wilson holding anything, but one of his hands was at his waist when he and the defendant greeted each other by saying "[w]hat's up." Jennifer's statement further indicated that she began to walk away and then heard five or six gunshots coming from where Wilson and the defendant were standing. According to her statement, Jennifer did not see who fired the shots, but she looked back briefly and saw Wilson on the ground. She did not see anything in Wilson's hand when he was lying on the ground. Jennifer's written statement also indicated that, after the shooting, she had a conversation with the defendant in which he said that he wished it had never happened and he wished that Wilson was never out there that day. According to Jennifer's statement, the defendant told her that he knew he would have to face Wilson someday, but he wished it wasn't a situation in which Wilson's life was taken. Jennifer's statement also indicated that, during this conversation, the defendant was upset and crying and said that his life was pretty much over because of what he had done to Wilson. Attached to Jennifer's statement was a photograph of Wilson as well as a photograph of herself that was taken when she signed her statement.

¶ 15    Jennifer's grand jury testimony relayed substantially the same facts as those set forth in her written statement, but also indicated that she was in the vicinity of the shooting during the evening hours of June 6, 2005, when she saw Wilson, whom she described as "the one who [the defendant] had gotten into it," get something from his car and then walk toward the defendant. Jennifer also testified before the grand jury that "there was some type of fight going on between [the defendant] and [Wilson]." Jennifer testified that, after the shooting, she continued walking home because, by that time, detectives had already pulled up. During her grand jury testimony, Jennifer recognized and identified the handwritten statement that she had given to ASA Clarke, including the photograph of Wilson, which was attached as an exhibit to the statement. Jennifer testified that she had reviewed and signed each page of the statement and was given an opportunity to make any necessary corrections. Jennifer specifically denied that she was under the influence of drugs or alcohol when she made the statement. She also stated that no threats or promises were made to induce her to give the written statement, and she stated that ASA Clarke had treated her "[l]ike a regular person." Jennifer further stated that she was not under the influence of any drugs or alcohol at the time of her grand jury testimony and that no one had made any threats or promises to her that day.

¶ 16    When questioned at trial about the content of her written statement, Jennifer testified that she made up a story implicating the defendant in the shooting and signed the statement so that she would be able to leave the police station. Jennifer admitted telling Clarke that she was not under the influence of alcohol or drugs when she gave the statement and that it was given freely and voluntarily. Jennifer acknowledged that a photograph of Wilson was attached to her statement and

that she had identified him as the man who was shot on June 6, 2005. However, she denied ever seeing or affixing her signature to the photograph of herself that was attached to the statement.

¶ 17    Jennifer was also questioned about the substance of her testimony before the grand jury. Jennifer acknowledged that she was under oath when she appeared before the grand jury and answered questions posed by ASA Diana Garcia-Camilo. Jennifer further stated that Garcia-Camilo interviewed her before they went into the grand jury room and that she told Garcia-Camilo that she had been threatened by the police detectives prior to giving her written statement. With few exceptions, Jennifer stated that she could not remember what she had said during the grand jury proceedings.

¶ 18    Jennifer testified that her prior written statement and grand jury testimony were not true. She claimed that, when she told the police that she had not seen the shooting, they accused her of lying and threatened to take her children away, to charge her as an accessory to murder, and to force her to have her baby in jail if she did not change her story and sign a statement inculpating the defendant. Jennifer testified that she made up the story that was contained in her written statement to avoid being charged in connection with the shooting, and she told the same story during the grand jury proceedings. She further stated that, during the three days between her written statement and her grand jury testimony, the police repeatedly came to her house and threatened to cut off her public aid and to call the Department of Children and Family Services (DCFS) if she did not testify.

¶ 19    Jennifer stated that she told ASA Clarke and ASA Garcia-Camilo that she had been threatened by the police detectives, but both responded that the detectives' comments were not threats. Jennifer also testified that she told the grand jury that the police had threatened her. The

defendant attempted to introduce a prior statement by Jennifer to defense counsel, which related to her grand jury testimony, but the trial court sustained the prosecution's objection to its admission.

¶ 20    ASA Clarke testified that, on April 2, 2006, he spoke with Jennifer for approximately 30 minutes. According to Clarke, Jennifer was calm and cooperative during the interview, and she gave an oral statement describing the events she witnessed on the night of the shooting. Jennifer later agreed to have her statement documented in writing. Jennifer then repeated what she had told him during the oral statement, and he wrote it down as she spoke. Clarke testified as to the substance of Jennifer's written statement. When it was complete, he read the entire statement to Jennifer and asked her whether she wanted to make any changes. Jennifer responded that the statement was accurate, and she signed the bottom of each page, as well as the photograph taken of her at the time the statement was given.

¶ 21    Clarke further testified that, while he was alone with Jennifer and before he recorded her written statement, he asked her how she had been treated by the police and whether she had been threatened or promised anything in exchange for her statement. Jennifer answered that she had been treated "fine" and that no one had threatened her or told her what to say to him. Clarke specifically denied that Jennifer told him the detectives had threatened to take her children away from her and had threatened to arrest her as an accessory to the murder, thereby forcing her to have her baby in jail.

¶ 22    ASA Garcia-Camilo testified that, on April 6, 2006, she interviewed Jennifer for about 40 minutes and later presented her as a witness before the grand jury. According to Garcia-Camilo, Jennifer was cooperative, and she never said that she had been threatened by police detectives.

Garcia-Camilo particularly denied that Jennifer told her the detectives had threatened to contact DCFS, take her child away from her, or charge her with a crime. Garcia-Camilo recounted the substance of Jennifer's testimony before the grand jury. In addition, Garcia-Camilo testified that, during the grand jury proceedings, she showed Jennifer a photocopy of her prior handwritten statement, and Jennifer recognized the document as the statement she had given to ASA Clarke. Garcia-Camilo identified the transcript of Jennifer's appearance before the grand jury and stated that it contained Jennifer's full testimony during those proceedings. Garcia-Camilo further stated that, when Jennifer testified before the grand jury, she never mentioned that she had been threatened by the police.

¶ 23    The written statements by Jennifer, Epps, and Fordman and a transcript of Jennifer's grand jury testimony were admitted as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-10.1 (West 2004)). The defendant did not raise any objection to the admission of this evidence.

¶ 24    The defendant testified on his own behalf, stating that, at the time of the shooting, he was talking with a group of people on the comer of 75th Street and Colfax Avenue. Just before the shooting, he saw a man approach a nearby group of about five other men. The man and one member of the group got into argument and "squared off" like they were going to "box." The defendant then heard gunshots and ran from the scene along with everyone else. He did not see the shooting and did not see who got shot. The defendant admitted that he knew Epps and that he owned a van in June 2005. However, he denied knowing Wilson and also denied seeing either Epps or Jennifer in the vicinity of the shooting. Finally, the defendant admitted that he continued to talk to Jennifer, and he stated that she was someone whom he trusted and in whom he confided.

¶ 25    The jury found the defendant guilty of first-degree murder and also found that he had personally discharged the firearm that proximately caused Wilson's death. Upon consideration of the evidence and arguments in aggravation and mitigation, the court sentenced the defendant to a term of 48 years in prison.

¶ 26    On direct appeal, we affirmed the defendant's conviction and remanded for a correction to the mittimus. See *People v. Williamson*, No. 1-08-0238 (2009) (unpublished order under Supreme Court Rule 23) (*Williamson I*). We also affirmed the second-stage dismissal of the defendant's initial petition for postconviction relief, in which the defendant claimed that his trial counsel rendered ineffective assistance by not calling a man named Vincent Davidson to testify at his trial. See *People v. Williamson*, 2015 IL App (1st) 130932-U (unpublished order under Supreme Court Rule 23) (*Williamson II*).

¶ 27    In May 2016, the defendant requested leave to file a successive petition for postconviction relief alleging actual innocence based on newly discovered evidence from two witnesses, Michael Berry and Jeffrey Fields, who each alleged that the defendant was not the shooter. While that request was pending, the defendant filed a second request to file a successive postconviction petition in June 2017. In that proposed petition, the defendant again raised a claim of actual innocence based on newly discovered evidence, this time from a witness named Spencer Jackson, who does not appear to bear any relation to Jennifer Jackson. In an affidavit, Spencer alleged that he had witnessed the shooting of Wilson and that the shooter was not the defendant but instead a "light skin, slim black guy" with a tattoo under his eye. According to Spencer's affidavit, the man approached Spencer, asked Spencer if he was selling weed, and then told Spencer that he was looking for Wilson because Wilson had sold him some weed earlier that day that was laced with

PCP and he wanted his money back. While the unknown man and Spencer were talking, Wilson pulled up in his Cadillac and walked toward a crowd of people. The man saw Wilson and started to approach him. The man and Wilson began arguing, and the man then pulled out a gun and shot Wilson. Spencer averred that he first learned that the defendant had been convicted of the murder when the two met in prison, at which point he told the defendant that he would be willing to prepare an affidavit and testify on his behalf. Spencer stated that he had not come forward previously because the shooter had seen his face and he did not want to get involved.

¶ 28    The circuit court denied the defendant leave to file both postconviction petitions. In a consolidated appeal, we reversed the denial of leave to file as to Fields' and Spencer's affidavits, concluding that both affidavits were newly discovered, material and noncumulative, and of a conclusive character. See *People v. Williamson*, 2019 IL App (1st) 162511-U, ¶¶ 37-42 (unpublished order under Supreme Court Rule 23) (*Williamson III*). Notably, we observed that "[b]oth the Fields and Spencer affidavits constitute material evidence because their potential testimony goes to the central issue of the identity of Wilson's shooter and each provided a first-person account of the shooting that directly contradicted the prior statements of Fordman, Epps, and [Jennifer]." *Id.* ¶ 39. Further, Fields' and Spencer's "description of the shooter as someone other than defendant and Spencer's account of the shooter's alleged motive are details that were not presented to the jury, and therefore were not cumulative." *Id.*

¶ 29    We also found that the affidavits "are of such a conclusive character that, if presented, would probably change the result on retrial." *Id.* ¶ 40. We based that conclusion on the fact that the affidavits "contradict the prior statements of all three of the State's eyewitnesses to the shooting" and "comport with the theory of the defense at trial, which was that defendant was

present on the scene in the crowd of people, but was not the shooter." *Id.* We further observed that "this evidence of defendant's innocence would be stronger when weighed against Fordman's, Epps', and [Jennifer's] prior statements, *** especially so where, as here, Fordman and [Jennifer] did not see who shot the gun." *Id.*

¶ 30 On remand, the defendant's petitions were consolidated and the State filed an answer, following which the circuit court advanced the petition to a third-stage evidentiary hearing. Prior to the hearing, the defendant's counsel advised the court that, despite using an investigator and conducting internet searches, she was unable to locate Jeffrey Fields and requested a continuance. The court expressed displeasure at the delay and noted that three years had passed since the case had been remanded back to the circuit court, but the court granted a final continuance.

¶ 31 At the ensuing evidentiary hearing, only Spencer testified, and the defendant did not present any testimony or evidence relating to Fields. Spencer testified that he knew both the defendant and Wilson from the neighborhood, where he had lived for all of his life, but he was not friends with either of them. According to Spencer, immediately before the shooting he had gone to the liquor store near the scene of the shooting. After he exited the store, a light-skinned man with a tattoo whom he had never seen before approached and "asked me something about someone sold him some PCP weed, and kept going from there." Spencer then saw the man shoot Wilson. Spencer did not know whether the defendant was there that night, but he was certain that the defendant was not the shooter.

¶ 32 Spencer explained that he had not come forward with this information earlier because he did not want to get involved, specifically stating, "You don't get involved in that type of stuff. You mind your business and keep it moving. That is how you stay safe." That changed when he

encountered the defendant in prison and learned that the defendant had been convicted of the murder. At that point, he told the defendant, "I know a little bit more than what you think," and he offered to testify for the defendant because he knew that the defendant did not commit the murder. Spencer acknowledged that he had been convicted of second-degree murder and attempted murder, and the State entered certified copies of his convictions into evidence.

¶ 33    Following the hearing, the circuit court entered an order denying the defendant's petition. The court began by noting that it was not considering Fields' affidavit in its analysis of the defendant's actual innocence claim because the defendant had not offered it as evidence at the hearing. The court then found that the defendant had failed to show that Spencer's testimony was material, noncumulative, and conclusive. Specifically, the court first explained that Spencer's testimony "that he saw another man shoot the victim is cumulative of [the defendant's] trial testimony that he was not the shooter and another man was responsible." The court then continued that Spencer's testimony was not conclusive and would not probably change the result on retrial because Fordman, Epps, and Jennifer had each implicated the defendant as the actual or apparent shooter in their pre-trial statements: "Juxtaposed with the testimony provided by the State's occurrence witnesses, who identified Petitioner either as the person who shot the victim or stood next to the victim as shots were fired, the testimony provided by Spencer Jackson does not place the original trial evidence in a different light or undermine this Court's confidence in the judgment of guilt." This appeal follows.

¶ 34    On appeal, the defendant raises two primary issues, contending first that the circuit court erred in several ways in denying his petition and then arguing that his postconviction counsel rendered ineffective assistance by failing to present evidence regarding Fields and by unreasonably

delaying the proceedings. We agree with the defendant that the circuit court erred in finding that Spencer's testimony did not warrant relief on his claim of actual innocence. That determination moots our consideration of the defendant's claim of ineffective assistance of postconviction counsel.

¶ 35    In challenging the circuit court's denial of his petition, the defendant makes several different arguments, but we only need to address one of them, which is his contention that the court erred by finding that Spencer's evidentiary hearing testimony was not material, noncumulative, or conclusive, despite our prior ruling that Spencer's account, if testified to, would satisfy those requirements. We agree with the defendant, as the court's ruling contradicted our prior decision in *Williamson III* and is also at odds with analogous caselaw.

¶ 36    The Act provides a three-stage review process for a defendant's postconviction claim of a constitutional violation, only the third of which is at issue in the present appeal. At a third-stage evidentiary hearing, the defendant must show by a preponderance of the evidence that there was a substantial violation of a constitutional right during his trial proceedings. *People v. Coleman*, 2013 IL 113307, ¶ 92 (citing *People v. Stovall*, 47 Ill. 2d 42, 47 (1970)). "At the third stage, unlike the first and second stages, the allegations are not taken as true; instead, 'the trial court acts as a factfinder, making credibility determinations and weighing the evidence.' " *People v. House*, 2023 IL App (4th) 220891, ¶ 78 (quoting *People v. Reed*, 2020 IL 124940, ¶ 51)). "A reviewing court will not reverse a trial court's findings regarding credibility determinations or fact finding after a third-stage evidentiary hearing unless the findings are manifestly erroneous." *Id.* (citing *Reed*, 2020 IL 124940, ¶ 51). The court's ultimate decision to deny relief following an evidentiary hearing is likewise reviewed for manifest error. *Coleman*, 2013 IL 113307, ¶ 98 (citing *People v.*

*Morgan*, 212 Ill. 2d 148, 155 (2004)). "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.* (citing *Morgan*, 212 Ill. 2d at 155, and *In re Cutright*, 233 Ill. 2d 474, 488 (2009)).

¶ 37    To succeed on a claim of actual innocence, a defendant must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). Only the second and third elements are at issue in this appeal. Material evidence is "relevant and probative of the petitioner's innocence" (*id.* ¶ 96 (citing *People v. Smith,* 177 Ill. 2d 53, 82-83 (1997)), and "[n]oncumulative means the evidence adds to what the jury heard" (*id.* (citing *People v. Molstad,* 101 Ill. 2d 128, 135 (1984)).

¶ 38    If the defendant's evidence qualifies as new, material, and noncumulative, the court must then determine whether it is of conclusive character, meaning that, "when considered along with the trial evidence, [it] would probably lead to a different result." *Id.* (citing *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009)). Conclusive evidence "places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97. In conducting this analysis, a court should not redecide the defendant's guilt, and "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 39    Looking first at whether Spencer's testimony was material and noncumulative, we agree with the defendant that the circuit court committed manifest error in determining that it was neither. The circuit court provided no explanation for why it believed that Spencer's account was not material, while it stated that Spencer's testimony "that he saw another man shoot the victim is

cumulative of [the defendant's] trial testimony that he was not the shooter and another man was responsible." In *Williamson III*, we specifically addressed these issues and held that Spencer's account is material because it "goes to the central issue of the identity of Wilson's shooter and *** provided a first-person account of the shooting that directly contradicted the prior statements of Fordman, Epps, and [Jennifer]." *Williamson III*, 2019 IL App (1st) 162511-U, ¶ 39. We also found that Spencer's description of the shooter as someone other than the defendant and his information regarding the shooter's alleged motive "are details that were not presented to the jury, and therefore were not cumulative." *Id.* Nothing in Spencer's evidentiary hearing testimony, which was consistent with his affidavit, has altered these conclusions, and the circuit court manifestly erred in finding that testimony not material and merely cumulative.

¶ 40    We reach the same conclusion regarding the final element of conclusiveness. The circuit court determined that Spencer's testimony was not of conclusive character by reviewing the old evidence presented at the defendant's trial and considering the potential effect of Spencer's new testimony, with the court ultimately stating, "[j]uxtaposed with the testimony provided by the State's occurrence witnesses, who identified [the defendant] either as the person who shot the victim or stood next to the victim as shots were fired, the testimony provided by Spencer Jackson does not place the original trial evidence in a different light or undermine this Court's confidence in the judgment of guilt." While the court's methodology was proper, we agree with the defendant that an opposite conclusion from that analysis is clearly evident.

¶ 41    To begin, we already explained in *Williamson III* that Spencer's potential testimony identifying someone other than the defendant as the shooter was sufficient to qualify as conclusive evidence because it "contradict[s] the prior statements of all three of the State's eyewitnesses to

the shooting" and "comport[s] with the theory of the defense at trial, which was that defendant was present on the scene in the crowd of people, but was not the shooter." *Williamson III*, 2019 IL App (1st) 162511-U, ¶ 40. The State contends that our holding on this point was reliant on the defendant presenting a second similar account from Fields, which he ultimately did not do during third-stage proceedings, and was also limited to the context of first-stage proceedings, in which the defendant only needed to demonstrate a colorable claim of actual innocence. See *People v. Edwards,* 2012 IL 111711, ¶ 24. However, nothing in our order imposed any such constraints on our holding that Spencer's account of the shooting qualified as conclusive evidence. Indeed, a materially indistinguishable decision from the supreme court supports the conclusion that, even within the context of third-stage proceedings, a single witness contradicting the State's trial witnesses and identifying someone other than the defendant as the perpetrator is sufficient to establish a claim of actual innocence and to warrant a new trial.

¶ 42    In *Ortiz*, 235 Ill. 2d at 322-24, the defendant was convicted of murder based solely on the pre-trial statements of two witnesses who had recanted those statements at trial. A decade later, the defendant filed a postconviction petition raising an actual innocence claim based on newly discovered evidence from a new witness, a fellow gang member, who ultimately testified at a third-stage evidentiary hearing that he witnessed the murder and saw someone other than the defendant shoot the victim. *Id.* at 326-27. The circuit court denied the defendant's petition on grounds that the new testimony was cumulative (*id.* at 327), while not making any finding that the new witness' account was not credible (*id.* at 334). On appeal, both the appellate court and the supreme court concluded that the circuit court had committed manifest error in denying the defendant's petition. *Id.* at 327-28, 337.

¶ 43    Although the circuit court had denied the petition as cumulative, the supreme court also examined the conclusiveness of the new evidence and determined that the newly discovered evidence directly contradicting the recanted pre-trial statements of the trial witnesses was of a conclusive character. *Id.* at 336-37. The court noted that the State had been unable to discredit the new evidence and that no physical evidence linked the defendant to the crime. *Id.* at 337. As a result, "at retrial, the evidence of defendant's innocence would be stronger when weighed against the recanted statements of the State's eyewitnesses." *Id.* The court continued:

> "The fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts. As we said in *Molstad,* 'this does not mean that [defendant] is innocent, merely that all of the facts and surrounding circumstances, including the testimony of [defendant's witnesses], should be scrutinized more closely to determine the guilt or innocence of [defendant].' " (Alterations in original.) *Id.* (quoting *Molstad*, 101 Ill. 2d at 136).

¶ 44    We do not see any basis on which to distinguish *Ortiz* from the present case. Like the defendant in *Ortiz*, the defendant in this case was convicted solely on the prior statements of witnesses who recanted those statements at trial, and there was no physical evidence linking him to the murder. Also like *Ortiz*, the defendant has presented new evidence from an alleged eyewitness to the crime who testified that someone other than the defendant committed the offense. Further, although the new witnesses in the two cases each had or have character issues, with the witness in *Ortiz* being a gang member and Spencer being a convicted murderer, in both cases the circuit courts did not make any findings that the new accounts were not credible, and the State did not otherwise discredit the new testimony. In this case, the circuit court merely found that, when

compared to the trial evidence, Spencer's testimony would not probably change the result on retrial. The supreme court's decision in *Ortiz*, however, demonstrates that the court's conclusion on that point was manifestly erroneous.

¶ 45    Ultimately, Spencer's new testimony identifying someone other than the defendant as the shooter, an account that was not materially inconsistent with the defendant's trial testimony or the trial testimony of Fordman, Epps, or Jessica, "places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. Therefore, the defendant is entitled to a new trial, which is not barred by double jeopardy because the evidence presented at his first trial was legally sufficient to sustain his conviction. See *People v. Wells*, 2023 IL 127169, ¶ 38 ("The remedy for a successful claim of actual innocence is a new trial."); *People v. Jiles*, 364 Ill. App. 3d 320, 331 (2006) (explaining that double jeopardy does not preclude retrial of a defendant whose conviction was supported by sufficient evidence).

¶ 46    Accordingly, we reverse the denial of the defendant's petition for postconviction relief, vacate the defendant's conviction, and remand the cause to the circuit court for a new trial.

¶ 47    Reversed and remanded.